UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | **:** | **CRIM. NO.: 11-cr-142 (RCL)** |
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **vs.** | **:** | |
| | **:** | |
| **SHELLY S. SINGHAL,** | **:** | |
| **LORETTA FREDY BUSH,** and | **:** | |
| **DENNIS L. PELINO,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |
| | **:** | |

## GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO STRIKE, TO COMPEL DISCOVERY, AND FOR AN EVIDENTIARY HEARING

The United States of America, through undersigned counsel, submits this Omnibus Opposition to Defendants' Motions to Strike, to Compel Discovery, and for an Evidentiary Hearing.[1]

### FACTS

On May 10, 2011, a grand jury returned a ten count indictment against the defendants. The indictment alleged that the defendants engaged in a conspiracy and scheme to defraud the United States Securities and Exchange Commission ("SEC"), investors, and others through a series of undisclosed and disguised related party transactions and insider trading involving a publicly traded company, Xinhua Finance Limited ("Xinhua Finance"), which generated proceeds exceeding $50 million. Count One charged each defendant with conspiracy to commit mail fraud and submit false statements, in violation of Title 18, United States Code, Section 371. Counts Two through Five

---

[1]     This Omnibus Opposition responds to the following motions filed on January 30, 2012: (1) Defendants' Motion to Strike Irrelevant and Prejudicial Surplusage from the Indictment (ECF Doc. 50); (2) Defendants' Motion to Compel Discovery of Rule 16 and *Brady* Material in the Possession of the United States (ECF Doc. 51); and (3) Defendant Shelly S. Singhal's Motion to Compel Production of Documents and For an Evidentiary Hearing to Determine the Extent of the Receipt and Use of Privileged Information by the Government (ECF Doc. 52).

charged each defendant with mail fraud, in violation of Title 18, United States Code, Sections 1341 and 2.  Counts Six through Nine charged each defendant with false statements, in violation of Title 18, United States Code, Sections 1001 and 2.  Count Ten charged defendant Dennis L. Pelino with false statements, in violation of Title 18, United States Code, Section 1001.[2]

## ARGUMENT

**I.     The Defendants' Motion to Strike Irrelevant and Prejudicial Surplusage from the Indictment Should be Denied. [Opp. to ECF Doc. 50-1]**

The defendants have moved to strike allegations in the Indictment that they characterize as surplusage.  *See* ECF Doc. 50-1.  As this Court has recognized, "[m]otions to strike surplusage from an indictment are highly disfavored in this Circuit."  *United States v. Watt*, 911 F. Supp. 538, 553 (D.D.C. 1995).  A motion to strike surplusage from an indictment "should be granted only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir. 1998) (quoting 1 Charles Alan Wright, *Federal Practice and Procedure* § 127, at 426 (1982)).  "The standard under Rule 7(d) has been strictly construed against striking surplusage."  *Id.* (quoting *United States v. Jordan*, 626 F.2d 928, 930 n.1 (D.C. Cir. 1980)).  Such a motion is addressed to the discretion of the court.  *Rezaq*, 134 F.3d at 1134.

**A.     The Court should not strike as surplusage the collective reference of Xinhua Finance Limited and Xinhua Financial Network Limited.**

The defendants moved to strike as surplusage the Indictment's reference to Xinhua Finance as collectively Xinhua Finance Limited and its wholly-owned affiliate, Xinhua Finance Network

---

[2]     The government is filing concurrently an Omnibus Opposition to the Defendants' Motions to Dismiss, which contains a detailed recitation of the Indictment's allegations.

Limited.  ECF Doc. 50-1 at pp. 2-3.  The defendants do not contend that the allegation that Xinhua

Finance Network Limited was a wholly-owned affiliate of Xinhua Finance is irrelevant (or

inaccurate).  Nor do the defendants contend that it is inflammatory for the Indictment to refer to

Xinhua Finance Limited and Xinhua Finance Network Limited, collectively, as Xinhua Finance.

Instead, the defendants argue that the collective reference "will sow confusion in the record, to the

detriment and prejudice of the defendants."  *Id.*  The defendants, however, do not identify how

equating a wholly-owned corporate affiliate to its parent corporation prejudices them.  In the absence

of any contention that the allegations are irrelevant or inflammatory, together with the absence of

any demonstrable prejudice, the allegations should not be struck as surplusage.

**B.      The Court should not strike as surplusage the allegations concerning the SEC.**

The defendants have moved to strike certain allegations in the Indictment concerning the

SEC as surplusage.  *See* ECF Doc. 50-1 at pp. 3-5.  The defendants' contentions here, as in their

numerous motions to dismiss the Indictment, are based on their flawed premise that Xinhua Finance

was "required only to provide copies of what they filed in foreign jurisdictions to the SEC."  *Id.* at

p. 3.  As discussed in the government's Omnibus Opposition to the Defendants' Motions to Dismiss,

however, the SEC had jurisdiction over the allegedly false mailings and false statements sent and

furnished to the SEC in Washington, D.C., including the content of those reports, pursuant to Rule

12g3-2b(3) as well as Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

As a result, the Indictment's reference to the function of the SEC is not irrelevant,

inflammatory, or prejudicial.  *See* Indictment ¶ 23.  The allegation concerning the SEC is relevant

background information on the SEC.  Such background information on the regulatory agency that

was allegedly a victim of the defendants' fraudulent conduct should, therefore, not be stricken as surplusage.

The defendants also object to the Indictment's use of the term "filing" in paragraph 2 of the Indictment as "legally inaccurate." ECF Doc. 50-1 at p. 5.  The Indictment referred to one of Xinhua Finance's reports submitted to the SEC and made available to the public by the SEC as a "public filing," rather than a "public report."  *See* Indictment ¶ 2.  The defendants do not claim, nor could they, that the use of the term "filing" in that paragraph was inflammatory or prejudicial.

In addition, the defendants moved to strike the word "filed" from paragraph 3 of the Indictment, arguing that Xinhua Finance "did not file anything with the SEC as that term is understood for securities law purposes."  ECF Doc. 50-1 at p. 3.  The defendants do not claim, however, that the use of the word "filed" in paragraph 3 was inflammatory or prejudicial.

In any event, the Indictment correctly referred to the word "filed" in paragraph 3 in alleging that "Xinhua Finance filed notices with the SEC to qualify for the registration exemption" to raise funds from U.S. investors.  Xinhua Finance "filed" forms with the SEC to sell shares to U.S. investors.  For example, Xinhua Finance filed a Form D with the SEC on multiple occasions as part of its offering of securities to U.S. investors.[3]  In addition, pursuant to the SEC's requirements for Xinhua Finance to offer American Depository Receipts ("ADRs") for sale in the United States, Xinhua Finance and the defendants "filed" a Form F-6 registration statement with the SEC in July

---

[3]     Issuers, such as Xinhua Finance, which sold securities in reliance on an exemption provided in Regulation D or Section 4(6) of the Securities Act of 1933 were required to file such notices on Form D.  An example of a Form D publicly filed by Xinhua Finance is available at: http://www.sec.gov/Archives/edgar/vprr/04/9999999997-04-018408.

2005 to register 20,000,000 ADRs.  The top of Xinhua Finance's Form F-6 stated the following: "As filed with the Securities and Exchange Commission on July 12, 2005."[4]

### C.     The language in paragraph 59 of the Indictment is not surplusage.

The defendants moved to strike as surplusage the following language used as part of the conspiracy charge in paragraph 59 of the Indictment: "combined, conspired, confederated and agreed with one another and with others to commit offenses against the United States."  The defendants acknowledge that the conspiracy statute, 18 U.S.C. § 371, uses the words "conspire" and "to commit any offense against the United States."  *See* ECF Doc. 50-1 at p. 6 n.4.  As a result, the defendants appear to object to the words "combined," "confederated," and "agreed," which are essentially lay terms for "conspire."  Such words may be cumulative, but they are not irrelevant or inflammatory and hardly rise to the level of objection struck as surplusage in *United States v. Hubbard*, 474 F. Supp. 64, 83 (D.D.C. 1979) (striking as surplusage words such as "infiltrate," "burglary," "cover up," "covertly," "bogus," "illegally," and "operatives").

### D.     The language alleging a related party transaction in paragraphs 37 through 48 is not surplusage.

The defendants move to strike the words "related party transaction" in paragraphs 37 through 48, specifically paragraphs 42, 43, 45, and 48.  ECF Doc. 50-1 at p. 6.  Those paragraphs allege a scheme in which Singhal arranged for Bush and Pelino to sell their Xinhua Finance shares through a Singhal nominee, Bedford Proprietary Trading LLC ("Bedford"), to disguise Singhal's involvement in the sale of those shares.  In the case of some of Bush's shares sold through Bedford, Bush entered into agreements with Bedford allegedly to give the false appearance that Bush had not sold any of

---

[4]      A copy of Xinhua Finance's Form F-6 is available publicly at the following: http://www.sec.gov/Archives/edgar/data/1287221/000101915505000153/xinhuaf6.htm.

5

her Xinhua Finance shares, but had merely pledged the shares to Bedford for purposes of securing a loan.  *See* Indictment ¶ 42.  The defendants object to the words "related party transaction" in those paragraphs because "there is not a single allegation that Xinhua Finance Limited was in any way a participant in the purported stock sales."  ECF Doc. 50-1 at p. 7.

The defendants' objection, however, ignores the defendants' positions at Xinhua Finance and the multiple positions held by Singhal at Xinhua Finance.  The Indictment alleged that Singhal was both a Xinhua Finance director and one of the Company's investment advisors.  *See* Indictment ¶ 7.  The alleged share sales involved Xinhua Finance's CEO, Bush, and one of its independent directors, Pelino, allegedly selling their shares secretly through Singhal.  In addition, in the case of Bush, there were allegedly agreements created at Singhal's direction to make the distributions to Bush from the proceeds of the share sales appear to be loans.  *See* Indictment ¶ 42.  As a result, one corporate officer/director (Bush) purported to obtain a loan from a nominee controlled by another corporate director and investment advisor (Singhal).  If legitimate, the "loan" transactions effectively resulted in Bush owing millions of dollars to Singhal.  The materiality of such a potential conflict of interest on the part of Bush as Xinhua Finance's CEO and director, which would not be lost on investors, supports the allegation that the defendants used the nominees, rather than Singhal directly, to avoid the obligation of Xinhua Finance to disclose publicly a related party transaction.[5]

---

[5]        Although not applicable to Xinhua Finance, the ill-repute (and materiality) of corporate loans to directors and officers is reflected in Section 13(k) of the Securities Exchange Act of 1934, which makes it unlawful for any issuer, "directly or indirectly, including through any subsidiary, to extend or maintain credit, to arrange for the extension of credit, or to renew an extension of credit, in the form of a personal loan to or for any director or executive officer."

**E.      The remaining paragraphs in the Indictment do not contain surplusage.**

The defendants have also moved to strike as surplusage language in the following paragraphs of the Indictment: 1; 30; 37; 41; 42; 43; 45; 60; 61.c; 62.a-62.d; 62.h; 62.z-62.ff; and 62.gg.  *See* ECF Doc. 50-1 at pp. 7-11.  As demonstrated below, none of those paragraphs contains surplusage.

The allegations in paragraphs 37 and 38 of the Indictment concerning Xinhua Finance's insider trading and confidentiality policies are not surplusage.  The defendants' contentions here, as discussed above, are based on their flawed premise that "the U.S. securities laws" do not "govern the relevant conduct of Xinhua Finance."  *Id.* at p. 8.  As discussed in the government's Omnibus Opposition to the Defendants' Motions to Dismiss, however, the SEC had jurisdiction over the allegedly false mailings and false statements sent and furnished to the SEC in Washington, D.C., including the content of those reports, pursuant to Rule 12g3-2b(3) as well as Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

In addition, the allegations concerning Xinhua Finance's insider trading and confidentiality policies are relevant to the notice provided to the defendants concerning Xinhua Finance's perceived obligation to disclose share sales by insiders.  The notices provided by those policies, together with the materiality to investors of information concerning insider stock sales, allegedly motivated the defendants to use nominees to conceal their involvement in the acquisition and sale of Xinhua Finance shares owned directly and beneficially by them.  Put simply, the Indictment alleges that the defendants were corporate insiders, *i.e.*, officers and directors.  The Indictment also alleges that those insiders sold Xinhua Finance shares owned directly and beneficially by them.  Those sales, when combined with the allegation that the defendants sold the shares without disclosing their sales to Xinhua Finance, are properly characterized as undisclosed insider trading.  Even if such accurate

allegations were prejudicial to the defendants, any such prejudice does not render the allegations irrelevant or inflammatory.

Contrary to the defendants' arguments, the allegations in paragraphs 62.a through 72.d are not surplusage. *See* ECF Doc. 50-1 at p. 9. Those paragraphs allege overt acts in furtherance of the transaction involving Entree Capital, LLC ("Entree Capital"). The defendants' contention that those paragraphs describe "a business transaction that was completely legal, altogether innocuous and, more importantly . . . irrelevant to the allegations in the Indictment," *id.*, ignores the Indictment's earlier allegations concerning the Entree Capital transaction. *See* Indictment ¶¶ 25-36. As alleged, Singhal and Pelino initially acquired the promissory note through allegedly false representations and deceptive practices, *id.* at ¶ 25, including the use of a nominee and a fictitious entity, Brightline Capital, *id.*, at ¶ 29. Entree Capital, another alleged nominee entity controlled by Singhal, ultimately acquired the rights to the Xinhua Finance shares held by the fictitious entity, Brightline Capital. *Id.* ¶¶ 29-30. Contrary to the defendants' arguments, the fact that the allegations in paragraphs 62.a through 62.d pre-date Xinhua Finance's initial public offering does not make them irrelevant, inflammatory, or prejudicial. *See* ECF Doc. 50-1. Instead, the allegations are relevant to demonstrate that the conspiracy was at work as early as January 2004. *See Yates v. United States*, 354 U.S. 298, 334 (1957) ("function of the overt act in a conspiracy prosecution is simply to manifest 'that the conspiracy is at work,' and is neither a project still resting solely in the minds of the conspirators nor a fully completed operation no longer in existence") (quoting *Carlson v. United States*, 187 F.2d 366, 370 (10th Cir. 1951)).

For similar reasons, the allegations in paragraphs 62.z through 62.ff are not surplusage. Those paragraphs allege efforts, as part of defendants' scheme, to sell Xinhua Finance shares to an

investor in the District of Columbia.  The shares at issue had allegedly been transferred by Bush to

nominee entities controlled by Singhal, Bedford Proprietary Trading, LLC ("Bedford") and Bedrock

Securities LLC ("Bedrock Securities").  *See* Indictment ¶¶ 15-16, 39-44.  The fact that the proposed

transaction did not go through, or in the defendants' words was a "*potential* transaction," *see* ECF

Doc. 50-1 at p. 10 , does not make the allegations irrelevant, prejudicial, or inflammatory.  *See*

*United States v. Root*, 366 F.2d 377, 383 (9th Cir. 1966) ("Title 18 U.S.C. § 371 does not require

'mission accomplished,' only 'mission attempted.'  An overt act by the conspirators in an effort to

accomplish the mission satisfies the requirement of the statute.").

Similarly, the allegations in paragraph 62.h are not surplusage.  The allegations in that

paragraph concern overt acts by Singhal and Pelino in furtherance of the alleged conspiracy to lower

the exercise price on Entree Capital's warrants from $0.36 a share to $0.10 a share.  The allegation

is relevant to the charge that Singhal used Entree Capital as a nominee entity to conceal Singhal's

involvement in the transaction and that Pelino was working in tandem with Singhal to obtain benefits

for Entree Capital, which allegedly held the shares for the secret benefit of Singhal, Pelino, and

Bush.  The allegation is also relevant to the ultimate price allegedly paid out of pocket by Singhal

for the shares ($1,388,888), *see* Indictment ¶ 62.o, which the government will prove equated to $0.10

a share.[6]

The allegations in paragraphs 41 and 62.gg are not surplusage.  Those allegations concern

an investigation by the National Association of Securities Dealers ("NASD") concerning, among

---

[6]    The government expects to prove at trial that, pursuant to the original warrant
agreement, Entree Capital obtained the right to purchase 13,888,888 shares of Xinhua Finance
for US$4,999,999.68 (or $0.36 a share).  The eventual price paid by Singhal out-of-pocket for the
shares, $1,3888,888, equated to the $0.10 a share sought by Singhal.

other things, the sale of Bush's Xinhua Finance shares through Singhal's entity, Bedrock Securities. The allegations also concern allegedly false and misleading testimony provided by Singhal to the NASD during that investigation related to the trading of Bush's Xinhua Finance shares. The allegations are relevant to the chain of events that led to the alleged back-dating of the contracts between Bush and Bedford, *see* Indictment ¶ 42, and to the transfer of Bush's Xinhua Finance shares from Bedrock Securities to Bedford, *id.* ¶¶ 43-44. These allegations are also relevant concerning, among other things, Singhal's efforts to use nominees to mask Singhal's control over the trading of Bush's shares.

II.   **The Defendants' Motion to Compel Discovery of Rule 16 and *Brady* Material in the Possession of the United States Should be Denied. [Opp. to ECF Doc. 51-1]**

The defendants have moved to compel discovery of Rule 16 and *Brady* material for, according to the defendants, "seven narrow categories of documents and information." ECF Doc. 51-1 at p. 1. As demonstrated below, the government has complied with its discovery obligations concerning those seven categories.

A.   **The government has produced records evidencing the $50,000,000 in alleged proceeds from the transactions.**

The Indictment included a forfeiture allegation for a sum of money of at least $50,000,000 for the proceeds obtained directly and indirectly as a result of the offenses in Counts One through Five. The $50 million figure was comprised of the aggregate amounts obtained by the defendants from the following transactions alleged in the Indictment:

- The Entree Capital transaction allegedly resulted in the defendants obtaining approximately $18,200,000 in proceeds. *See* Indictment ¶ 35. The government has produced to the defendants the brokerage statements from UBS reflecting the trading in the Xinhua Finance shares and the banking records from multiple bank accounts controlled by Singhal reflecting the distribution of those proceeds to the defendants,

including the international bank records reflecting the distribution of the proceeds to Bush's account in Hong Kong.

- The Bedrock Securities and Bedford transactions allegedly resulted in defendants Bush and Pelino obtaining approximately $25,700,000 in proceeds. *Id.* ¶ 47. The government has produced to the defendants the brokerage statements from UBS reflecting the trading in the Xinhua Finance shares and the banking records from multiple bank accounts controlled by Singhal reflecting the distribution of those proceeds to the defendants, including the international bank records reflecting the distribution of the proceeds to Bush's account in China.

- The Wiremill transactions allegedly resulted in defendants Singhal and Bush obtaining approximately $7,300,000 in proceeds. *Id.* ¶ 47. The government has produced to the defendants the banking records from multiple bank accounts controlled by Singhal reflecting the distribution of those proceeds to the defendants, including the international bank records reflecting the distribution of the proceeds to Bush's account in China.

**B.     The government was not required to produce documents containing its legal theories of the case.**

The defendants seek to compel the government to "identify the law(s) or regulation(s) that imposed an obligation on Xinhua Finance (or its officers and directors) to disclose certain information contained in the[] foreign filings."  ECF Doc. 51-1 at pp. 7-8.  The government had declined to provide such information as part of its Rule 16 discovery obligations.  Rule 16(a)(2) exempts documents, not under Rule 16(a)(1), made in connection with the investigation that might contain the government's mental impressions, legal conclusions, or theory of the case.  The defendants have not sought a bill of particulars requesting such information.

As discussed above, the basis for the defendants' request is their erroneous contention that "Xinhua Finance's obligations to report anything at all stem entirely from foreign law obligations." ECF Doc. 51-1 at p. 7.  As discussed in the government's Omnibus Opposition to the Defendants' Motions to Dismiss, however, the SEC had jurisdiction over the allegedly false mailings and false statements sent and furnished to the SEC in Washington, D.C., including the content of those reports,

pursuant to Rule 12g3-2b(3) as well as Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Given that the defendants in their multiple motions to dismiss cited repeatedly to Rule 12g3-2b, including Rule 12g3-2b(1) and its legislative history, *see, e.g.,* ECF Doc. 40-1 at pp. 11-14, it is surprising that they were unable to locate the reporting provision concerning "information material to an investment decision" in Rule 12g3-2(b)(3), which remains in effect today.  *See* 17 C.F.R. § 240.12g3-2b(3).

C.      **The government will comply with its discovery obligations concerning rough notes of interviews containing *Brady* materials.**

The defendants seek to compel the government to produce any notes taken by FBI agents or government attorneys during their interviews of relevant witnesses.  ECF Doc. 51-1 at p. 9.  In terms of materials required to be disclosed under *Brady v. Maryland*, 372 U.S. 83 (1963) and its progeny, the government will produce the rough notes taken by FBI agents during interviews with individuals who arguably disclosed *Brady* materials.[7]  The government will also review any rough notes taken by prosecutors during those interviews and identify for the defendants the substance of any *Brady* materials in those notes not otherwise disclosed in the FBI 302s or the rough notes from the agents.

D.      **The government is not aware of the destruction of materials subject to discovery.**

The defendants seek the identity of "all information, received from any source, that any government official, agent, or investigator destroyed or failed to preserve."  ECF Doc. 51-1 at 11. In the instant motion, they made a more particularized request concerning "the destruction of evidence or other information relevant to this case."  *Id.*  The government is not aware of the

---

[7]      The government has produced certain FBI Form 302s for various witnesses that arguably included *Brady* material.  The government will produce the rough notes of the agents from those interviews.

destruction of evidence or other information relevant to this case or otherwise required to be preserved or produced under Rule 16, *Brady*, *Giglio*, or any other requirement.[8]

### E.   The government has complied with its obligation to produce certain documents to the defendants.

The defendants seek "exact copies of each and every mail or other written or electronic communication referred to the Indictment." ECF Doc. 51-1 at p. 11.  Although the government admittedly produced a voluminous amount of discovery materials to the defendants, they have not identified any specific documents referenced in the Indictment that they were unable to locate in the materials provided to them.  The defendants state that they "attempted to locate each of the documents through [their] own efforts," *id.* at p. 13, but they do not state that they were unsuccessful. This is not a case, as the defendants suggest, of "a hide-the-ball approach" by the government. *Id.* at p. 12.  If the defendants genuinely cannot locate specific documents referenced in the Indictment, the government will identify them by Bates-number, as it previously did in response to requests concerning specific documents. *Id.* at n.12.

### F.   The government has complied with its obligation to produce documents concerning the allegations in paragraph 24 of the Indictment.

The defendants seek to compel the government to identify "which filings Mr. Singhal had an opportunity to review and describe in detail how Mr. Singhal 'had an opportunity to review' those filings." ECF Doc. 51-1 at p. 13.  In addition, the defendants seek to compel the government to produce "[a]ll documents or other information evidencing that Ms. Bush did not review 'certain of

---

[8]       During the course of its investigation, the government made requests of certain parties to re-produce documents that the parties had represented were produced to the government.  Those parties complied with the government's requests.  As a result, the government believes that to the extent it received materials from third-parties, and to the extent those materials were potentially discoverable under Rule 16 or otherwise, they were retained.

the filings made public by the Tokyo Stock Exchange and distributed to the holders of Xinhua

Finance's securities." *Id.* at p. 14.  As demonstrated below, the government's response referring to

witness statements and discovery materials was sufficient.

Although styled as a motion to compel, the defendants' request for the government's theories

and evidence should be treated as a request for a bill of particulars.[9]  It is well established that "[a]

bill of particulars is not a discovery tool or a devise for allowing the defense to preview the

government's theories or evidence." *United States v. Ramirez*, 54 F. Supp. 2d 25, 29 (D.D.C. 1999).

Further, "it bears noting that '[i]t is not the function of a bill of particulars to provide detailed

disclosure of the government's evidence in advance of trial.'" *United States v. Brodie*, 326 F. Supp.

2d 83, 91 (D.D.C. 2004) (quoting *Overton v. United States*, 403 F.2d 444, 446 (5th Cir. 1968)).

"[U]nlike discovery, a bill of particulars is intended to give the defendant only that minimum amount

of information necessary to permit the defendant to conduct his *own* investigation and not to provide

the defendant with the fruits of the government's investigation." *United States v. Sanford Ltd.*, 11-

cr-352 (BAH), 2012 WL 256058, at *5 (D.D.C. Jan. 30, 2012) (quoting 1 Charles Alan Wright &

Andrew Leipold, *Federal Practice and Procedure: Criminal § 130* (4th ed. 2008)).[10]  As a result, the

---

[9]     There is nothing in Rule 16 that requires the government to identify such evidence specifically.  In addition, to the extent the defendants' request seeks information covered by *Brady, see* ECF Doc. 51-1 at pp. 14-15, the government has produced to the defendants (and will continue to produce) materials that arguably contain *Brady* information.

[10]     *See also Britt v. North Carolina*, 404 U.S. 226, 239 (1971) ("Even a common-law request for a bill of particulars to clarify an indictment normally does not require a prosecutor to divulge the names of his witnesses or the nature of his physical or documentary evidence."); *United States v. Geise*, 597 F.2d 1170, 1181 (9th Cir. 1979) ("defendant is not entitled to know all the evidence the government intends to produce, but only the theory of the government's case"); *United States v. Vasquez-Ruiz*, 136 F. Supp. 941, 943 (7th Cir. 2001) ("defendant is only entitled to be informed of the charges against him; he is not entitled to know the details of how the government will go about proving its case").

defendants' efforts to obtain a detailed disclosure of the government's evidence in advance of trial should not be countenanced.

> **G.      The government should not be compelled to disclose its requests to foreign authorities.**

The defendants have moved to compel the requests made by the government to foreign authorities for evidence located outside the United States.[9]   The defendants claim, without any specifics, that those requests "are material to preparing a defense." ECF Doc. 51-1 at 16.  There is no support in Rule 16 (or anywhere else) requiring the government to produce the requests to foreign authorities.  Similarly, Rule 16 does not require the government to produce to the defendants the underlying grand jury subpoenas transmitted to domestic third-parties.  The defendants' request for such information under the guise of a motion to compel is an attempt to get around the well-established law that "a bill of particulars is intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his *own* investigation and not to provide the defendant with the fruits of the government's investigation." *Sanford Ltd.*, 2012 WL 256058, at *5.

**III.      Defendant Shelly S. Singhal's Motion to Compel Production of Documents and For an Evidentiary Hearing to Determine the Extent of the Receipt and Use of Privileged Information by the Government Should be Denied. [Opp. to ECF Doc. 52-1]**

Defendant Singhal renews his request for relief from the Court concerning disclosures made to the government by his former attorney and business partner, Robert Brown.[10]  In June 2010,

---

[9]      The government has produced the records produced by the foreign authorities, but has declined to produce the requests transmitted to those authorities for the records.

[10]      On November 3, 2009, Brown pleaded guilty to a one count Information charging obstruction of justice, in violation of Title 18, United States Code, Section 1503.  *See United States v. Robert S. Brown*, 09-cr-267 (RCL).

Singhal moved to dismiss an Indictment returned against him in a related case, *United States v. Shelly S. Singhal*, 10-cr-108 (RCL), and disqualification of the prosecution team based on disclosures made by Brown to the government.  Judge Kennedy denied the motion.  *See* Opinion (filed July 29, 2010).[11]  Singhal renewed his motion to dismiss in August 2010, including a request that the government provide a full accounting of the documents provided by Brown to the government.  This Court denied the motion on March 14, 2011.  *See* Order (filed Mar. 14, 2011). In denying the motion, the Court noted Singhal's past unsuccessful attempts to establish a valid attorney-client privilege in the communications revealed to the government.  *Id.* at p. 15 ("The Court has now gone through two rounds of document review related to Singhal's allegation that the government has invaded his attorney-client privilege, and both times, the search has yielded no privileged materials.  At some point, the fishing expedition has to stop.").

According to the defendant, the instant motion is different from his previous motions because it "not only provides additional context and evidence to demonstrate that the government obtained privileged material, but also seeks to compel the production of information as part of the government's discovery obligations."  ECF Doc. 52-1 at p. 2.  The government respectfully submits that the instant motion is different from the previous motions in name only.

The defendant's fundamental premise that "the government received from Brown, without permission from Mr. Singhal, privileged information in both written and oral form," *id.*, is baseless. Neither Judge Kennedy nor this Court has identified a single piece of information provided by Brown to the government protected from disclosure by the attorney-client privilege.  Instead, both

---

[11]     The government also refers the Court to Misc. Actions 10-190, 10-193, and 10-211, which remain under seal, concerning other proceedings on this issue.

Judge Kennedy and this Court have held – without exception – that every document and utterance provided by Brown to the government was not protected by the attorney-client privilege.  In addition, upon the government's motion, the Court recently compelled the defendant to produce documents withheld by Singhal on the basis of an asserted attorney-client privilege, including communications subject to the crime-fraud exception to the attorney-client privilege.  *See* Mem. Op., 10-cr-108 (RCL) (filed Feb. 2, 2012).[12]  For the reasons previously stated by the government in its oppositions to the defendant's motions to obtain similar relief based on the same facts, the Court should decline the defendant's invitation to charter another fishing expedition.

---

[12]    The government is unaware of any authority, and none is cited by the defendant, *see* ECF Doc. 52-1 at p. 16, obligating the government to produce to a defendant communications between the government and counsel for a cooperating witness.  Although the defendant complains about the disparity of detail between the FBI 302s from Brown's interviews and Brown's Statement of Offense, *id.* at pp. 17-18, the defendant does not appear to contend that Brown's Statement of Offense included privileged communications between Brown and Singhal.  Further, since the disparity can be attributed to the details contained in documents voluntarily produced by Brown to the government, which this Court has already determined did not contain privileged communications, together with documents produced by others and inferences therefrom, there is no basis to contend that the materials in Brown's Statement of Offense included communications protected by the attorney-client privilege.

**CONCLUSION**

For the foregoing reasons, the Court should deny the defendants' motions to strike, to compel, and to hold an evidentiary hearing.

Respectfully submitted,

ROBERT OKUN
Acting United States Attorney
In and For the District of Columbia

By:      _____
MICHAEL K. ATKINSON
JONATHAN HOOKS
Assistant United States Attorneys
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C.  20530
202.252.7817 (Atkinson)
202.252.6731 (Hooks)
Michael.Atkinson2@usdoj.gov
Jonathan.Hooks@usdoj.gov

DATED: February 27, 2012