**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| _____ ) | | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | Case No.: 11-Cr-142 (RCL) |
| SHELLY S. SINGHAL, | ) | |
| LORETTA FREDY BUSH, and | ) | |
| DENNIS L. PELINO | ) | |
| | ) | |
| Defendants. | ) | |
| _____) | | |

**DEFENDANTS' REPLY TO GOVERNMENT'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS COUNTS SIX THROUGH NINE
(ALLEGED FALSE STATEMENTS) FOR FAILURE TO ALLEGE
A MATTER WITHIN THE JURISDICTION OF THE SEC**

Defendants hereby file their Reply to Section II of the _Government's Omnibus_

_Opposition to Defendants' Motions to Dismiss_ (Dkt. No. 61 at 12-22) ("Opposition") addressing

_Defendants' Motion to Dismiss Counts Six through Nine (Alleged False Statements) for Failure_

_to Allege a Matter Within the Jurisdiction of the SEC_ (Dkt. No. 40) ("Defendants' Motion").

Counts Six through Nine of the Indictment (the "false statement" counts) are premised on

alleged misstatements or omissions made by Xinhua Finance Limited ("Xinhua Finance") in

certain annual and semi-annual reports furnished to the Securities and Exchange Commission

("SEC" or "Commission") in accordance with the foreign filing exemption stated in Rule

12g3-2(b). As explained in Defendants' Motion, however, those reports, consistent with the

Rule, were merely English-language translations of filings made in Japan. Because those reports

were drafted to be compliant solely with the requirements of foreign law, the substantive content

of those reports did not come under the SEC's jurisdiction, and therefore the content of the

reports cannot give rise to a false statements charge.  The SEC's receipt of the furnishings was merely a peripheral activity of the Commission.

Understanding that a straightforward application of the foreign filing exemption is fatal to the false statement counts, the government urges the Court to adopt a novel interpretation of Rule 12g3-2(b) – the applicable regulation under which Xinhua Finance furnished its annual and semi-annual reports to the SEC.  The government asserts that Rule 12g3-2(b) requires a foreign issuer to provide both the annual and semi-annual reports (under subparagraph 1), and, separately and apart from that requirement, anything that is "material to an investment decision" (under subparagraph 3), regardless of whether it was disclosed in the home jurisdiction.  Dkt. No. 61 at 14.  The government then argues that, because the SEC can withdraw or remove a foreign issuer's exemption if such information is not provided, "the SEC had jurisdiction" for purposes of § 1001.  *Id*. at 18-19.

The government is simply incorrect when it states that a foreign issuer is under a "*separate and continuing mandate*" to furnish to the SEC "information that is material to an investment decision," *id*. at 33 n.20 (emphasis added), "*[i]n addition to* the information required to be furnished by the foreign issuer under Rule 12g3-2(b)(1)."  *Id*. at 17-18 (emphasis added).  To the contrary, as a matter of law, a foreign issuer exempt from the filing requirement by Rule 12g3-2 is obligated to furnish only information *already required* by the relevant foreign jurisdictions to the extent such information is material to an investment decision.  That is the whole point of the exemption – it allows a foreign issuer to avoid the costs and burdens of complying with multiple, potentially conflicting disclosure requirements.

The government cites no case, regulation, or other support for its contrary proposition, and for good reason.  The Defendants have been unable to locate a single instance (criminal,

administrative, or civil) where the government took the position that paragraph (b)(3) adds a separate and additional category of information that must to be provided to the government by an exempt foreign issuer.  To the contrary, the weight of authority demonstrates that the novel position the government advances in this case is simply wrong.

First, the government's interpretation contradicts the text of the Rule 12g3-2(b), which requires foreign issuers to furnish only those materials required by paragraph (b)(1).  Paragraph (b)(3) does not set forth additional requirements, but instead narrows the terms of paragraph (b)(1).  Second, the SEC's own interpretation of Rule 12g3-2(b) directly contradicts the interpretation proposed by the government in its Opposition.  The SEC has repeatedly gone on record to state that paragraph (b)(3) *narrows* the scope of information required by paragraph (b)(1); it does not expand it.  Third, the government's flawed reading of the regulation would undermine the purpose of Rule 12g3-2(b).  As the SEC made clear when it promulgated Rule 12g3-2(b), the Rule provides that foreign issuers "are *exempted* from the proxy rules and insider reporting and trading regulations."  32 Fed. Reg. 7,846 (May 30, 1967) (emphasis added).  The government's position in this case would, in effect, reinstate these very rules and regulations, forcing foreign issuers to abide by home regulations as well as those of the United States.  This interpretation cannot be reconciled with the stated purpose of the Rule.

In short, the government's interpretation of paragraph (b)(3) contradicts the plain language and purpose of Rule 12g3-2(b), as well as the SEC's interpretation of it, and should be rejected by the Court.  And if the government's interpretation is rejected, the government has no reasoned basis to contend that the SEC had authority to take action against Xinhua Finance for the content of its reports that were drafted for Japanese regulators.  Because the SEC had no

power to act upon the furnishings submitted by Xinhua Finance, the Commission's receipt of the submissions was simply a peripheral activity of the agency.

Nor does the government's invocation of Rule 10b-5 create jurisdiction for the SEC to take action in regard to the furnishings submitted by Xinhua Finance.  The SEC has expressly excluded from the reach of Rule 10b-5 the furnishings submitted by exempt issuers like Xinhua Finance.

Finally, and separate from the above arguments, under Rule 12g3-2(a), a foreign issuer automatically qualifies for the exemption if it does not have 300 U.S. investors.  The government does not dispute that Xinhua Finance had less than 300 U.S. investors at the time of the alleged false statements.  If Xinhua Finance automatically qualified for the exemption (which it did), the SEC clearly had no authority or power to act or withdraw the exemption, and therefore lacked jurisdiction for the purpose of section 1001.

For all of the foregoing reasons, and as explained more fully below, the charges relating to the alleged false statements (Counts Six through Nine) should be dismissed.

## ARGUMENT

I.      **RULE 12g3-2(b) DOES NOT ADD A NEW CATEGORY OF INFORMATION TO BE FURNISHED TO THE SEC; IT MERELY LIMITS WHAT TYPES OF INFORMATION SHOULD BE PROVIDED**

In its Opposition, the government contends that "SEC's regulations required Xinhua Finance to furnish to the SEC (1) the annual and semi-annual reports, *and* (2) information material to an investment decision."  Dkt. No. 61 at 14 (emphasis added).  The government argues these are "*separate and continuing mandate[s]*" that require the foreign issuer "to furnish to the SEC information material to an investment decision" "*[i]n addition to* the information required to be furnished by the foreign issuer under Rule 12g3-2(b)(1)(i) and (iii)."  *Id.* at 33 n.20, 17-18 (emphasis added).  As demonstrated by the text of the rule, the administrative record,

and a common sense application of the purpose underlying the exemption at issue, the

government's interpretation of Rule 12g3-2(b) is simply incorrect, and cannot support its

jurisdictional argument.

**A.      The Text Of Paragraph (b)(3) Is Contrary To The Government's Proposed Interpretation**

Rule 12g3-2(b) is unambiguous.  In order for a foreign private issuer to be exempt from

section 12(g) of the Exchange Act, the issuer:

> i.    Shall furnish to the Commission whatever information in each of the following categories the issuer since the beginning of its last fiscal year
>
> > (A)   has made or is required to make public pursuant to the law of the country of its domicile or in which it is incorporated or organized,
> >
> > (B)   has filed or is required to file with a stock exchange on which its securities are traded and which was made public by such exchange, or
> >
> > (C)   has distributed or is required to distribute to its security holders . . . .

17 C.F.R. § 240.12g3-2(b)(1).[1]  Paragraph (b)(1) also contains four other subsections, each one

containing the directive that the foreign issuer "shall furnish" various items to the SEC.  *See* Rule

12g3-2(b)(1)(ii)-(v).

In contrast, paragraph (b)(3) contains no such directive, and instead *narrows* the

information to be provided under paragraph (b)(1):

> (3)   The information required to be furnished under this paragraph (b) is information material to an investment decision such as: the financial condition or results of operations; changes in business; acquisitions or dispositions of assets; issuance, redemption or acquisitions of their securities; changes in management or control, the granting of options or the payment of other renumeration to

---

[1]      The Defendants cite the version of the Rule in effect at the time of the alleged false statements.

directors or officers; and transactions with directors, officers or principal security holders.

17 C.F.R. § 240.12g3-2(b)(3).

Thus, all of the information that a company "shall furnish" is organized under paragraph (b)(1). Paragraph (b)(3), on the other hand, does not use the "shall furnish" language. It does not demand that the foreign issuer furnish any information, but instead limits the information required under (b)(1). To state it another way, the SEC does not require (or want) a foreign issuer to furnish *every* document distributed to security holders. *See* Rule 12g3-2(b)(1)(i)(C). Paragraph (b)(3) merely states that any material information falling under (b)(1) should be furnished and then lists examples of information that the SEC considers material. In describing the documents that should be provided under paragraph (b)(1)(i)-(v), the SEC helps a foreign issuer determine what information under paragraph (b)(1) is (and is not) responsive to the Rule. Accordingly, paragraph (b)(3) clarifies that only that material that was distributed to security holders AND is material must be furnished to the Commission.

"A regulation should be construed to give effect to the natural and plain meaning of its words." *Diamond Roofing v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976). Here, the plain reading of the regulation is unambiguous, and the government's contrary interpretation of the rule should not be countenanced.[2]

---

[2]    Not only is this reading the only logical one supported by the text, but the grand jury (and government) understood this in drafting the Indictment in this case. Paragraph 24 of the Indictment alleges:

> Xinhua Finance was required, pursuant to the exemption from registration upon which it relied, to furnish to the SEC the information: (a) Xinhua Finance made or was required to make public pursuant to the laws of Japan or the Cayman Islands; (b) Xinhua Finance filed or was required to file with and which was made public by the Tokyo Stock Exchange; or (c) Xinhua Finance distributed or was required to distribute to the holders of its securities.

**B.      The Regulatory History And SEC's Interpretations Of Rule 12g3-2(b)(3) Demonstrate That The Paragraph Is Meant To Narrow, Not Expand, The Category Of Information To Be Provided To The SEC**

The government cites no guidance from the SEC to support its novel interpretation of Rule 12g3-2(b).  This is unsurprising.  As stated in detail in Defendants' Motion, the SEC adopted Rule 12g3-2 in 1967, after reviewing the requirements and practices of many countries whose issuers trade in the United States, and determining that foreign regulatory oversight was generally sufficient to ensure that appropriate information was being disseminated by those issuers.  *See* Exchange Act Release No. 34-8066, 32 Fed. Reg. 7797, 7846-47 (1967), attached as Exhibit 1.  After it became satisfied with the reporting obligations of foreign nations, the SEC determined that "[f]oreign companies . . . may obtain an exemption from section 12(g) by furnishing to the Commission copies of certain information which they have made public abroad or have sent to their security holders."  *Id.*  Notably, the SEC made no mention of requiring *additional* information.

In fact, at the time of the 1967 adoption of Rule 12g3-2(b)(3), the text was even more explicit:

> The information required to be furnished pursuant to *subparagraph (1)(i) and (iii)* of this paragraph is that about which investors ought reasonably to be informed with respect to the issuer and its subsidiaries concerning: The financial condition or results of operations; changes in business; acquisitions or dispositions of assets; issuance, redemption, or acquisitions of their securities; changes in management or control; the granting of options or the payment of other remuneration to directors or officers; transactions with directors, officers, or principal security holders; and any other

---

Indictment, ¶ 24.  These numbered subparts of paragraph 24 correspond directly with Rule 12g3-2(b)(1)(i)(A)-(C), indicating that the grand jury, at least, was instructed and believed that these categories of information represented the full universe of documents that were required to be furnished by Xinhua Finance to the SEC.  In contrast, the Indictment contains absolutely no references to any requirement that Xinhua Finance *also* had to furnish "information material to an investment decision."

> information about which investors ought reasonably to be informed.

Exhibit 1 at 7848 (emphasis added).  Thus, paragraph (b)(3) of the original (1967) version of the regulation did not broaden the regulatory requirements, but clarified what information was to be submitted to the Commission pursuant to subparagraphs (b)(1)(i) and (iii).  As the SEC later explained, "Paragraph (b)(3) was designed to assure issuers that the rule did not require the furnishing of documents such as product catalogs and price lists but rather documents disclosing information of interest to investors."  Exchange Act Release No. 33-6433; 34-19187, 26 SEC Docket 654, 656 (1982-1983), attached as Exhibit 2.

The SEC has consistently interpreted Rule 12g3-2(b) in this manner.  A 1987 SEC Staff Report to Congress stated that for foreign issuers, as opposed to domestic issuers, "[i]nformation regarding transactions with management is required, but need be presented only to the extent the registrant discloses such information to its shareholders or otherwise makes public the information."  Report of the Staff of the SEC to the Senate Comm. on Banking, Housing and Urban Affairs and the House Comm. on Energy and Commerce, Internationalization of the Securities Markets, 110th Cong., 1st Sess., III-67-68 (July 27, 1987).  More recently, in a 2010 SEC no-action letter, the Commission clearly stated that issuers exempt under Rule 12g3-2(b) were required to furnish only copies of their annual reports "because they were subject to their home country, and not Exchange Act, disclosure rules."  SEC Release No. 34-63547, 2010 SEC LEXIS 4435, at *26 n.50.

The government does not even attempt to reconcile its new interpretation with the regulatory history, because it cannot.  All indications from the promulgation of the rule through the most recent amendments support the premise that Rule 12g3-2(b) imposes no additional reporting obligations beyond those required by the applicable foreign laws.  "It is well

established that courts must defer to an agency's reasonable interpretation of ambiguous provisions in a statute it administers generally." *Oceana, Inc. v. Locke*, Civ. Act. No. 10-744, 2011 U.S. Dist. LEXIS 145934 at *52 (D.D.C. Dec. 20, 2011); *see also Talk Am., Inc. v. Michigan Bell Tel. Co*., 131 S. Ct. 2254, 2260-61 (2011) (in the absence of any unambiguous statute or regulation, a court turns to an agency's interpretation of its regulations).  In this case, because the SEC has explicitly stated how it has construed paragraph (b)(3), the Court should construe the language in the same manner.

Members of the U.S. securities bar who specialize in counseling foreign private issuers have openly and definitively advised their clients that Rule 12g3-2(b)(3) *limits* the scope of information that must be furnished to the SEC and *does not* require disclosure of related party transactions beyond the demands of the issuer's home jurisdiction:

> Rule 12g3-2(b)(3)(i) states that the information sought by the rule is information "material to an investment decision," which carries the negative implication that immaterial information is outside the rule's reach.  Six types of information are listed as illustrations of the material required: financial information; changes in business; asset acquisitions and dispositions; securities issuances, redemptions and acquisitions; management or other control changes; option grants and other compensation to directors or officers; and related party transactions.  In most jurisdictions, information concerning executive compensation and related party transactions is very much less than what is required under the SEC's regulations.  The inclusion of these subjects in the list is not to add to the disclosure demands that an issuer is subject to under its home jurisdiction's system of securities regulation.

Sidley Austin LLP, *SEC Liberalizes Exchange Act Exemption From Registration For Foreign Countries*, Oct. 14, 2008, available at http://www.sidley.com/sidleyupdates/Detail.aspx ?news=3767; *see also* Nilene R. Evans, *Federal Securities Law, Exempted Transactions, Alternatives to Accessing the U.S. Public Markets*, 11-12 (Bloomberg Law, vol. 2, no. 34) (Aug. 24, 2009) (explaining the requirements for exemption and stating "a sponsored Level I ADR

program offers foreign private issuers access to U.S. investors without triggering U.S. federal securities reporting obligations").

### C.     The Purpose Of The Exemption Would Be Frustrated Under The Government's Interpretation Of Paragraph (b)(3)

The SEC has explained that, in enacting section 12(g)(3) of the Exchange Act, "Congress . . . indicated that it did not intend to impose . . . on foreign issuers" the otherwise "significant burdens and obligations" that were applicable to non-exempt issuers.  Exhibit 2 at 655.  Yet the government's interpretation of Rule 12g3-2(b) – which would require foreign issuers to furnish anything that is potentially "material to an investment decision" – would defeat the very purpose underlying the exemption.[3]

If the Court adopts the government's novel interpretation of Rule 12g3-2(b), foreign issuers will be forced to transition, over-night, to the U.S. securities regulatory structure – and its standards for materiality and disclosure.  This would be a seismic development.  As one commentator explained, "the regulation of securities markets vastly differs between the U.S and Japan.  It is well documented that the U.S. mandatory disclosure requirements are far more demanding in breadth and detail than those of Japan and other developed countries."  James D. Cox, *Regulatory Competition in Securities Markets: An Approach for Reconciling Japanese and United States Disclosure Philosophies*, 16 Hastings Int'l & Comp. L. Rev. 149 (1993). Likewise, another expert has opined that "[f]oreign exchanges have many similar requirements, but typically not to the extent of the U.S. securities markets."  Michael A. Schneider, *Foreign*

---

[3]     Although the government concedes that "ADRs that are not traded on the exchanges, such as Xinhua Finance's, *are not subject* to the Exchange Act's reporting requirements" and that Xinhua Finance's "ADRs are not subject to the periodic reporting obligations of the Exchange Act," the impact of their interpretation of Rule 12g3-2(b) would effectively nullify those exemptions.  Dkt. No. 61 at 15.

*Listings and the Preeminence of U.S. Securities Exchanges:  Should the SEC Recognize Foreign Accounting Standards?*, 3 Minn. J. Global Trade 301, 316 (1994).

Under the current regulatory scheme, a company trading securities on the Tokyo Stock Exchange and seeking an exemption under Rule 12g3-2(b) in the United States need only comply with Japanese securities laws and then furnish English-language translations of those documents made public or filed in Japan and provided to security holders.  Under the government's interpretation of Rule 12g3-2(b), the same company would not only have to strictly comply with Japanese securities laws and continue to submit the documents described above, but would also have to expend the necessary resources to ensure compliance with the more demanding – and potentially conflicting – U.S. requirements regarding disclosure and materiality.  This would demand the creation of new documents solely for the purpose of complying with U.S. regulations.  The Rule, and every government interpretation up until the filing of the Opposition in this case, requires nothing of the sort.

## II.   THE SEC DOES NOT HAVE JURISDICTION AS A RESULT OF THE ALLEGED FAILURE TO PROVIDE ADDITIONAL INFORMATION "MATERIAL TO AN INVESTMENT DECISION"

The errors in the government's analysis do not end at its flawed interpretation of Rule 12g3-2(b).  To the contrary, the government moves from its novel interpretation of the foreign filing exemption to an equally unsound argument that the SEC had the power to withdraw the exemption from Xinhua Finance based on the contents of the foreign filing.  Specifically, the government posits that Defendants (through Xinhua Finance) were required to provide information that was "material to an investment decision" in order for Xinhua Finance to obtain and maintain its exemption from registration, and Defendants' (or the Company's) failure to provide all material information provided grounds for the SEC to withdraw the exemption.  *See* Dkt. No. 61 at 18-19.  This is a circular theory based on several mis-steps in logic.

First, the government's argument is again premised on the notion that the Defendants were required to furnish an additional and separate category of information "material to an investment decision." But, as discussed above, that premise is wrong. And because an exempt foreign issuer is required to furnish only English-language translations of its foreign filings and releases, there is no basis for the government's premise that the SEC has authority to evaluate the contents of those *translations*.

Xinhua Finance complied with the Rule by submitting English-language translations of the information that it provided to its home exchange, and the government does not argue that Xinhua Finance failed to furnish everything required under paragraph (b)(1). Once such information was provided to the SEC, it had no authority or power to act upon the substance of the furnishings, and it had no ability to withdraw or remove Xinhua Finance's exemption based on the contents of the reports. Without any power to act, the Commission lacked "jurisdiction" as it is defined by the case law. *See United States v. Facchini*, 874 F.2d 638, 642 (9th Cir. 1989) ("[T]o establish jurisdiction, the information received must be directly related to an authorized function of the federal agency. Otherwise the scope of section 1001 jurisdiction would be virtually limitless."); *see also United States v. Holmes*, 111 F. 3d 463, 465 (6th Cir. 1997); *United States v. Ford*, 639 F.3d 718 (6th Cir. 2011); *United States v. Holstrom*, No. 06-30008, 2007 U.S. App. LEXIS 12329 (9th Cir. 2007).

The government argues, in cursory and conclusory fashion, that the *Holmes*, *Ford*, and *Holstrom* cases, briefed in the Defendants' Motion, are inapposite because they are "related to statements that were not filed directly with the regulating agency." Dkt. No. 61 at 21 n.9. But that is precisely the point. In each of those cases, the applicable "statements" were made to a

non-federal agency and the federal government had no direct oversight or involvement in verifying or policing the statements:

- In *Holmes*, the defendant filed fraudulent claims with the Michigan Employment Security Commission ("MESC") and then lied to investigators from that same Commission.  The Court noted that the USDOL, as part of its normal activity, would receive or access the false statements made by the defendant and held by the MESC.  The Court found that there was no jurisdiction.  *Holmes*, 111 F.3d at 466.

- In *Ford*, the defendant made false statements to the Tennessee Senate and Tennessee Registry of Election Finance, but the Department of Health and Human Services ("HHS") would have considered the alleged false statements as part of its routine activities.  The Sixth Circuit found there was not a "direct relation" between the alleged false statements and an authorized function of HHS, and therefore there was no jurisdiction for § 1001 purposes.  *Ford*, 639 F.3d at 719- 21.

- In *Holstrom*, the defendant submitted false timecards to her employer, an entity owned by the United States government that had a direct contractual relationship with the Department of Energy.  Although the government could have pulled its contract with her employer as a result of the falsities, the Court found that the DOE did not have a clear "power to act" with respect to the falsified timecards.  *Holstrom*, 2007 U.S. App. LEXIS 12329 at **3-5.

Likewise, the statements at issue here were not "filed" with the SEC; they were filed with foreign exchanges, and then copies were furnished to the SEC.

There was no "direct relationship" between an authorized function of the SEC and its receipt of the English-translations of the annual and semi-annual reports furnished by Xinhua Finance.  The most the government can muster, in terms of potential SEC action, is the possible decision to withdraw or remove the exemption from Xinhua Finance as a result of a failure to fully comply with Rule 12g3-2(b)(1).  But the SEC had no such power as long as Xinhua Finance furnished English-language translations of what it provided to Japanese regulators.  The government's Opposition does not dispute that this is precisely what Xinhua Finance did.  Therefore, there was no ability by the SEC to act on these furnishings and thus there was no jurisdiction.

Finally, the government points out that Xinhua Finance filed a Form F-6 in order to establish its ADR and that the Form F-6 requires the registrant to "disclose important information related to the issuance of the ADR."  Dkt. No. 61 at 15.  This is correct but irrelevant.  The Indictment does not even mention the Form F-6 or allege that the Defendants made any false statements in relation to that form.  The government's discussion of the Form F-6 is a red herring that exposes the overall weakness of its position.

## III.    THE SEC DOES NOT HAVE JURISDICTION OVER THE FURNISHINGS PURSUANT TO SECTION 10(b) AND RULE 10b-5

The government also argues "that the reports furnished by Xinhua Finance to the SEC were subject to the SEC's jurisdiction under Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b) and Rule 10b-5 thereunder."  Dkt. No. 61 at 19.  Once again, the government is simply wrong.

In the proposed rule-making for Rule 12g3-2(b), the SEC stated that "[a]ny document or report furnished pursuant to the proposed rule would not be deemed to be 'filed' with the Commission or otherwise subject to the liabilities of Section 18 of the [Securities Exchange Act

of 1934.]"  Exchange Act Release No. 34-7746, 30 Fed. Reg. 14737, 14739 (1965), attached as

Exhibit 3.   In the final Rule, which was enacted in 1967, paragraph (b)(5) stated:   "The

furnishing of any information or document pursuant to this paragraph (b) of this section shall not

constitute an admission for any purpose that the issuer is subject to the Act."   *See* Exhibit 1 at

7849.  The "Act" referred to in the Rule was the "Securities Exchange Act of 1934."   *See id.* at

7845 (defining the Act).   The 2005 version of the Rule (which is applicable to the instant case)

contains the same language as the 1967 version for purposes of paragraph (b)(5).   Thus, the

administrative record indicates that the Commission specifically exempted from liability under

the Exchange Act those materials furnished to the SEC under Rule 12g3-2(b).

Section 10(b), of course, is a provision of the Securities Exchange Act of 1934.   *See*

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 78 (2006) (Rule 10b-5 was

"promulgated in 1942 pursuant to § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b)").   "The Supreme

Court has interpreted section 10(b) and Rule 10b-5 . . . in accordance with its view of Congress'

intent in enacting the 1934 Act."   *United States v. Haddy*, 134 F.3d 542, 548 (3d Cir. 1998); *see*

*also Conlon v. University Computing Co.*, No. 3069-70, 1973 U.S. Dist. LEXIS 14679 (D.D.C.

1973) (noting that section 10(b) and Rule 10b-5 were enacted under the Securities Exchange Act

of 1934).   Thus, in accordance with the plain language of the Rule 12g3-2(b) and interpretative

statements by the SEC, the furnishing of information to the SEC pursuant to Rule 12g3-2(b),

does not subject the foreign issuer to section 10(b) or Rule 10b-5.

Moreover, section 10(b) does not punish all deceptive conduct, only deceptive conduct "in

connection with the purchase or sale of any security registered on a national securities exchange

or any security not so registered."  15 U.S.C. § 78j(b); *see also Morrison v. National Australia*

*Bank Ltd.*, _U.S._, 130 S. Ct. 2869, 2884 (2010).  As the Supreme Court has stated "[t]hose

purchase-and-sale transactions are the objects of the statute's solicitude.  It is those transactions that the statute seeks to 'regulate.'"  *Id.*

The government does not allege that Xinhua Finance's furnishing of the annual and semi-annual reports to the Commission were made "in connection with any purchase or sale of a security."  There is no discussion of a specific purchase or sale in the Indictment.  And of course, the Indictment does not charge the Defendants with 10b-5 violations.  This is a telling and fatal defect to the government's argument regarding jurisdiction under section 10(b) and Rule 10b-5.

Even if the Court were to reject the argument that there was no purchase or sale of securities "in connection" with the furnishing of the annual and semi-annual reports to the SEC, the securities at issue in the instant case were ADRs, traded over the counter and not listed on an American stock exchange.  The government's Opposition concedes that ADRs not traded on an exchange, like Xinhua Finance's, "are not subject to the Exchange Act's periodic reporting requirements."  Dkt. No. 61 at 15.  On the other hand, the government insinuates – citing *Pinker v. Roche*, 292 F.3d 361 (3d Cir. 2002) – that the mere trading of ADRs in the United States subjects a foreign issuer to U.S. jurisdiction.  *Id.* at 21.  This Court, however, has rejected such a broad reading of *Pinker*.  In *Allen v. Russian Federation*, 522 F. Supp. 2d 167 (D.D.C. 2007), Judge Kollar-Kotelly rejected plaintiffs' argument, based on *Pinker*, that raising funds and trading ADRs in the U.S. was alone sufficient to establish personal jurisdiction over the foreign issuer.  *Allen*, 522 F. Supp. 2d at 195.  Rather, Judge Kollar-Kotelly interpreted *Pinker* to hold only that trading of ADRs in the U.S. is but one factor in determining whether a foreign issuer has submitted to jurisdiction.  *Id.* at 195.  Moreover, in weighing that factor, Judge Kollar-Kotelly recognized that such trading activity had relatively little significance since it represented "unilateral activity of another party or a third person."  *Id.*

The significance of trading in ADRs also has been considered by courts construing the Supreme Court's decision in *Morrison*. The Southern District of New York recently held that that trading in ADRs is a predominantly foreign securities transaction to which § 10(b) is inapplicable. *See In re Societe Generale Sec. Litig.*, 08 Civ. 2495(RMB), 2010 U.S. Dist. LEXIS 107719, at *6 (S.D.N.Y. Sept. 29, 2010); *see also Copeland v. Fortis*, 685 F. Supp. 2d 498, 506 (S.D.N.Y. 2010); *In re SCOR* Holding (Switzerland) AG Litig., 537 F. Supp. 2d 556, 562 (S.D.N.Y. 2008); *Elliott Assocs. v. Porsche Automobiles*, 759 F. Supp. 2d 469, 475-76 (S.D.N.Y. 2010) (finding that domestic trading of swap agreement referencing a stock listed on a foreign exchange was equivalent to the purchase of the foreign shares of that company for the purposes of the extraterritoriality rule of *Morrison* and therefore not covered by § 10(b)). As in this case, the trading in ADRs in *Societe Generale* was not on an exchange but was over-the-counter. Thus under *Morrison* and its progeny, section 10(b) is likewise inapplicable here.

## IV.   THE SEC HAD NO JURISDICTION BECAUSE XINHUA FINANCE WAS COMPLETELY EXEMPT UNDER RULE 12g3-2(a) FROM FURNISHING ANYTHING TO THE SEC

Defendants demonstrated in their Motion that because Xinhua Finance had less than 300 U.S. investors, Xinhua Finance was automatically exempt from registering with the SEC or even furnishing any material to the SEC under Rule 12g-2(b), and therefore the SEC lacked jurisdiction. *See* Dkt. No. 40 at 19-20. The government does not deny that Xinhua Finance had less than 300 U.S. investors. Instead, it argues only that "the fact remains that Xinhua Finance actually furnished materials to the SEC *to obtain and retain* an exemption from registration and periodic reporting." Dkt. No. 61 at 21 (emphasis added). This misstates both the law and the facts and evidences the government's lack of understanding of the exemption process.

Under Rule 12g3-2(a), a foreign issuer *automatically* qualifies for the exemption if it does not have 300 U.S. investors. *See* Rule 12g3-2(a) (stating "[s]ecurities of any class issued by

a foreign private issuer *shall be exempt* from Section 12(g) of the Act if the class has fewer than 300 holders resident in the United States") (emphasis added).  The foreign issuer does not – as the government claims – need to furnish or submit any materials to the SEC to *obtain and retain* this exemption.  It is automatic.  Thus, the government's argument that Xinhua Finance submitted the furnishings "for the specific purpose of gaining access to American markets" is simply incorrect.  Xinhua Finance did not need to furnish material to the SEC to gain access to the markets – it was automatically exempted from such requirements.

Foreign issuers often submit the paragraph (b)(1) materials to the Commission prior to reaching the 300 investor threshold out of an abundance of caution due to uncertainty regarding when the threshold might be met.  Xinhua Finance's submissions to the SEC exemplify this point.  In March 2005, Xinhua Finance's counsel informed the SEC that only "105 persons who appeared to be a resident of the United States" owned shares in Xinhua Finance at the time of the filing.  *See* Exhibit 3 to Defendants' Motion, Dkt. No. 40.  As a result, Xinhua Finance *automatically* qualified for the exemption and was under no obligation to provide any information to the SEC.

Thus, even if the Court accepted the government's interpretation of Rule 12g3-2(b), the SEC had no ability to act on the receipt of these furnishings because the exemption was automatically available to Xinhua Finance.  For example, if Xinhua Finance had failed to furnish to the SEC documents that it had filed with foreign exchanges, the SEC would have no recourse where Xinhua Finance had already automatically qualified for the exemption.  The SEC could not institute any action against the foreign issuer in this circumstance much less remove the exemption.  The SEC's receipt of Japanese securities reports in such a scenario is entirely peripheral (if not superfluous) to the activities of the SEC.  Because the SEC has no ability to

take action in relation to the substance of the furnishings, it lacked jurisdiction under section 1001. *See United States v. Rodgers*, 466 U.S. 475, 479 (1984) (stating that "[a] department or agency has jurisdiction in this [§ 1001] sense, when it has the power to exercise authority in a particular situation").

## CONCLUSION

The Court should dismiss Counts Six through Nine because they fail to allege a violation of section 1001 insofar as they fail to address a "matter within the jurisdiction" of a federal agency, as required by the statute.

Dated:  March 19, 2012

Respectfully submitted by:

| | |
|---|---|
| _____/s/_____ Mark Srere_____ | _____/s/_____ |
| Mark A. Srere (DC Bar # 414487) | Atlee W. Wampler III (FL Bar No: 0311227) |
| P.J. Meitl (DC Bar # 502391) | Joseph R. Buchanan (FL Bar No: 0306762) |
| Kristin M. Robinson (DC Bar # 498216) | WAMPLER BUCHANAN WALKER |
| BRYAN CAVE LLP | CHABROW BANCIELLA & STANLEY, P.A. |
| 1155 F Street, NW, Suite 700 | 9350 South Dixie Highway, Suite 1500 |
| Washington, D.C.  20004 | Miami, Florida 33156 |
| Telephone: (202) 508.6050 | Telephone: (305) 577-0044 |
| Facsimile:  (202) 508.6200 | Facsimile:   (305) 577-8545 |
| mark.srere@bryancave.com | awampler@wbwcb.com |
| pj.meitl@bryancave.com | jbuchanan@wbwcb.com |
| kristin.robinson@bryancave.com | |

| | |
|---|---|
| _____/s/_____ | _____/s/_____ |
| Barbara Van Gelder (DC Bar #265603) | Earl J. Silbert (DC Bar #53132) |
| DICKSTEIN SHAPIRO LLP | Mitka T. Baker  (DC Bar #496317) |
| 1825 Eye Street NW | DLA PIPER US LLP |
| Washington, DC 20006-5403 | 500 8th Street, N.W. |
| Telephone: (202) 420-4845 | Washington, DC 20004 |
| Facsimile:  (202) 420-2201 | Telephone: (202) 799-4517 |
| vangelderb@dicksteinshapiro.com | Facsimile:  (202) 799-5517 |
| | earl.silbert@dlapiper.com |
| Counsel for Shelly Singhal | mitka.baker@dlapiper.com |
| | |
| | Counsel for Dennis Pelino |

| |
|---|
| _____/s/_____ |
| Charles S. Leeper (DC Bar # 310367) |
| Mark H. M. Sosnowsky (DC Bar # 979960 |
| DRINKER BIDDLE & REATH LLP |
| 1500 K Street, NW, Suite 1100 |
| Washington, DC 20005-1208 |
| Telephone: (202) 842-8800 |
| Facsimile:  (202) 842-8465 |
| charles.leeper@dbr.com |
| mark.sosnowsky@dbr.com |

Counsel for Loretta Fredy Bush

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 19th day of March, 2012, true and accurate copies of the

foregoing were sent via electronic filing with the Clerk of the Court using the CM/ECF system,

which will send notification of such filing to all counsel of record.


<u>/s/ P.J. Meitl</u>