### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**UNITED STATES OF AMERICA**            )
                                        )
**v.**                                  )          **Criminal Case No. 11-142 (RCL)**
                                        )
**SHELLY S. SINGHAL,**                  )
**LORETTA FREDY BUSH,**                 )
**DENNIS L. PELINO**                    )
                                        )
**Defendants.**                         )
_____ )

### <u>MEMORANDUM OPINION</u>

On May 10, 2011, a grand jury returned a ten-count Indictment against defendants Shelly S. Singhal, Loretta Fredy Bush, and Dennis L. Pelino. The Indictment alleges that defendants engaged in a conspiracy and scheme to defraud the United States Securities and Exchange Commission ("SEC"), investors, and others through a series of undisclosed and disguised related party transactions and insider trading that generated proceeds exceeding $50 million. Indictment ¶ 1. The Indictment reads like a typical U.S. securities fraud case, yet it does not expressly charge any violations of U.S. securities laws, including failure to report related party transactions or insider trading. Count One charges each defendant with conspiracy to commit mail fraud and submit false statements, in violation of 18 U.S.C. § 371. Counts Two through Five charge each defendant with mail fraud, in violation of 18 U.S.C. §§ 2 and 1341. Counts Six through Nine charge each defendant with false statements, in violation of 18 U.S.C. §§ 2 and 1001. Count Ten charges defendant Pelino with false statements, in violation of 18 U.S.C. § 1001.

Before the Court are defendants' Motions [39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49] to dismiss the Indictment, defendants' Motion [50] to strike surplusage from the Indictment, and defendants' Motions [51, 52, 53, 54] to compel.

## I.    FACTS

### A.    Background on Xinhua Finance and the Defendants

According to the Indictment, the alleged conspiracy and scheme to defraud related to transactions involving Xinhua Finance Limited and its wholly-owned affiliate, Xinhua Financial Network Limited (referred to collectively in the Indictment as "Xinhua Finance").   Xinhua Finance provided information products focused on China's financial markets, including market indices, ratings, financial news and analysis, and investor relations.   Indictment ¶ 2.   Xinhua Finance was organized under the laws of the Cayman Islands and headquartered in Shanghai, China.  *Id.*

In October 2004, Xinhua Finance's shares began to trade publicly on the Tokyo Stock Exchange's Mothers Board (market of the high-growth and emerging stocks).  *Id.* ¶ 3.   Xinhua Finance was the first Chinese Initial Public Offering in Japan, the first non-Japanese entity to list on the Mothers Board, and the first time a foreign stock traded in Japan through an international settlement agreement, which allowed investors globally to invest in Xinhua Finance.  *Id.*

According to the Indictment, defendant Bush co-founded Xinhua Finance and was its Chief Executive Officer and Vice Chairman of Xinhua Finance's Board of Directors.  *Id.* ¶ 5. Defendant Pelino, Xinhua Finance's other co-founder, served as an independent member of Xinhua Finance's Board of Directors, Chairman of its Compensation Committee, and a member of its Audit Committee and Investment Committee.  *Id.* ¶ 6.   Defendant Singhal served as an independent member of Xinhua Finance's Board of Directors, Chairman of its Audit Committee,

and a member of its Compensation Committee and Investment Committee. *Id.* ¶ 4.  Singhal also provided investment advisory services to Xinhua Finance through his company SBI USA, LLC. *Id.* ¶ 7.

### B.    Xinhua Finance's Entry and Involvement in U.S. Capital Markets

According to the Indictment, starting in or around 2003 Xinhua Finance began to raise funds from U.S. investors.  Indictment ¶ 3.  Rather than register these offerings with the SEC, Xinhua Finance filed notices with the SEC to qualify for registration exemptions under U.S. securities laws.  *Id.*  After obtaining its public listing in Japan in October 2004, Xinhua Finance sought increased access to U.S. capital markets.  In April 2005, Xinhua Finance began furnishing the SEC with information to establish an exemption from registration for the offer and sale of securities in the United States.  *Id.*  To sell ADRs on the U.S. over-the-counter market, Xinhua Finance was required, pursuant to the exemption from the reporting requirements of the Securities Exchange Act upon which it relied, to furnish to the SEC the information: (a) Xinhua Finance made or was required to make public pursuant to the laws of Japan or the Cayman Islands; (b) Xinhua Finance filed or was required to file with and which was made public by the Tokyo Stock Exchange; or (c) Xinhua Finance distributed or was required to distribute to the holders of its securities.  *Id.* ¶ 24; *see also* 17 C.F.R. § 240.12g3-2(b)(1) (2005).  In July 2005, Xinhua Finance established in the United States a sponsored Level 1 American Depository Receipt ("ADR") facility.  *Id.*  Xinhua Finance's ADRs traded on the U.S. over-the-counter market using the stock trading symbol "XHFNY."  *Id.*

### C.    The Alleged Scheme to Defraud

The Indictment identifies various nominees and nominee entities that the defendants used to engage in a number of transactions involving Xinhua Finance.  Indictment ¶¶ 8–22.  The

defendants used the nominees and nominee entities for the following alleged purposes: (1) to obtain cash, warrants, stock, and other things of value from Xinhua Finance; (2) to sell shares of Xinhua Finance stock owned directly and beneficially by Singhal, Bush, and Pelino; and (3) to transfer assets off of Xinhua Finance's balance sheet to minimize potentially negative impacts to that balance sheet. *Id.* ¶¶ 25–57. The defendants' alleged motivation for using the nominees and nominee entities to engage in the transactions involving Xinhua Finance, rather than engaging in them using their own names or the names of their own companies, was to misrepresent and avoid disclosing the defendants' involvement in the transactions and the sale of their Xinhua Finance shares in statements furnished to the SEC, investors, and others. *Id.* ¶ 61. According to the Indictment, the defendants and others used the nominees and nominee entities for those purposes and with that alleged motivation to engage in the following transactions involving Xinhua Finance: (1) the Entree Capital transaction; (2) the Bedrock Securities and Bedford transactions; and (3) the Wiremill and Hyperion transactions.

### 1.    *The Entree Capital Transaction*

All three defendants were allegedly involved in the Entree Capital transaction. Singhal and Pelino, allegedly through false representations and deceptive practices, obtained a warrant to purchase 6,944 Xinhua Finance shares. *Id.* ¶¶ 25–27. The Indictment alleges that rather than purchase the shares in their own names or in the name of one of their companies, they used a nominee and a fictitious entity, Brightline Capital LLC, to buy the warrant. *Id.* ¶ 29. Singhal used nominees, including Robert S. Brown, to exercise the warrant and deposit the 6,944 Xinhua Finance shares into a brokerage account in the name of another nominee entity, Entree Capital LLC ("Entree Capital"). *Id.* Following a request by Singhal and Pelino, Bush, as Xinhua Finance's CEO, authorized an acceleration of the lock-up period for the Xinhua Finance shares

held by Entree Capital, which allowed Singhal—through Entree Capital—to begin selling the Xinhua Finance shares approximately four weeks before investors who held similarly restricted shares.  *Id.* ¶¶ 31, 62(i)–(n).

Singhal and his company, SBI USA, paid Xinhua Finance $1,388,888 of the $5 million exercise price for the 6,944 shares held by Entree Capital.  *Id.* ¶ 32.  The Indictment alleges that, with Pelino's assistance, Sinhal attempted to have the exercise price for the shares lowered from $0.36 per share to $0.10 per share.  *Id.* ¶ 62(h).  If successful, the exercise price for the warrants would have totaled $1,388,888.  Although that effort to lower the exercise price of the shares was unsuccessful, the Indictment alleges that Singhal used a nominee, Brown, to direct Xinhua Finance to credit to Entree Capital $3,611,111, which Xinhua Finance purportedly owed originally to Wire Mill Partners II, LLC, a nominee entity controlled by Singhal.  *Id.* ¶¶ 33, 62(p)–(q).

At Singhal's direction, Entree Capital sold the 6,944 Xinhua Finance shares for total proceeds of approximately $21,700,000.  *Id.* ¶ 34.  One of Singhal's associates allegedly kept Bush and Pelino apprised of the Xinhua Finance share sales by Entree Capital.  *Id.* ¶¶ 62(r), 62(t).  Entree Capital, at Singhal's direction, allegedly distributed the proceeds from the share sales for the principal benefit of Singhal, Bush, and Pelino.  *Id.* ¶ 35.

As a result of the Entree Capital transaction, the defendants allegedly caused Xinhua Finance to furnish statements to the SEC that misrepresented and failed to disclose: (a) a related party transaction between Xinhua Finance, its CEO (Bush), and members of its Board of Directors (Singhal and Pelino) concerning the acquisition of the warrant, acceleration of the lock-up period, and exercise of the Xinhua Finance shares held by Entree Capital; (b) Singhal, Bush, and Pelino had an ownership interest in the Xinhua Finance shares held by Entree Capital;

and (c) Singhal, Bush, and Pelino sold Xinhua Finance shares for proceeds of approximately $21,700,000 through Entree Capital for their personal benefit.  *Id.* ¶ 36.

### 2.    *The Bedrock Securities and Bedford Transactions*

The Indictment alleges that Singhal assisted Bush and Pelino to engage in undisclosed trading of their Xinhua Finance shares through nominee entities, Bedrock Securities LLC ("Bedrock Securities") and Bedford Proprietary Trading, LLC ("Bedford"), which were allegedly controlled by Singhal.  *Id.* ¶¶ 15–16, 37–48.  Between January 6, 2006 and May 2008, according to the Indictment, Singhal assisted Bush in selling 36,736 Xinhua Finance shares beneficially owned by Bush.  *Id.* ¶¶ 39–44, 46–47.  The share sales generated over $23,000,000 in proceeds.  *Id.* ¶ 47.  During the same time period, Singhal assisted Pelino in selling 3,914 Xinhua Finance shares owned by Pelino, which generated approximately $2,500,000 in proceeds.  *Id.* ¶ 45.

With regard to these share sales, Bush allegedly entered into backdated, written agreements with Bedford and a nominee.  *Id.* ¶ 42.  The agreements were allegedly created to give the false appearance that Bush had not sold any of her Xinhua Finance shares and that she had merely pledged them to Bedford for purposes of securing a loan.  *Id.*  Bedford's operations allegedly consisted of receiving shares belonging to Bush, selling those shares at the direction of Singhal and Bush, and distributing the proceeds for Bush's primary benefit.  *Id.* ¶¶ 42–43.  As part of this transaction, Singhal allegedly provided false and misleading testimony to the National Association of Securities Dealers ("NASD") during its investigation of Bedrock Securities concerning, among other things, the sale of Bush's Xinhua Finance shares.  *Id.* ¶¶ 41, 62(gg).

Singhal allegedly controlled and used the nominee and nominee entities to disguise his involvement in the sale of Bush's Xinhua Finance shares.  *Id.* ¶ 42.  Pelino allegedly did not enter into written agreements with Bedford concerning the sale of his 3,919 Xinhua Finance shares, but rather allegedly transferred the shares to Bedford, which sold the shares at Singhal's direction.  *Id.* ¶ 45.  Pelino allegedly used Bedford to conceal and disguise the sale of his Xinhua Finance shares.  *Id.*

### 3.     *The Wiremill Transactions*

The Indictment charges that Xinhua Finance entered into agreements with two nominee entities controlled by Singhal, Wire Mill Partners II and Wiremill, in which Xinhua Finance agreed to pay commissions to Wire Mill Partners II and Wiremill in return for them introducing certain transactions to Xinhua Finance.  *Id.* ¶ 49.  The transactions introduced by Wire Mill Partners II and Wiremill to Xinhua Finance included the receipt by Xinhua Finance of securities assets in publicly traded companies in consideration for Xinhua Finance providing business development services in China for the various publicly traded companies listed in the United States.  *Id.*  According to the Indictment, in the short term, the securities assets received by Xinhua Finance from the various publicly traded companies listed in the United States positively affected Xinhua Finance's balance sheet.  *Id.*

Singhal, according to the Indictment, controlled and used Wire Mill Partners II and Wiremill as nominees to disguise Singhal's interest and involvement in the activities of Wire Mill Partners II and Wiremill.  *Id.* ¶ 50.  As discussed earlier, Xinhua Finance credited $3,611,111 to Wire Mill Partners II in return for transactions purportedly introduced by Wire Mill Partners II to Xinhua Finance.  Singhal, in turn, allegedly directed Wire Mill Partners II to apply the $3,611,111 to the exercise price for the warrant held by Entree Capital for the benefit

of the defendants.  *Id.* ¶ 51.  Singhal and Bush allegedly received $5,500,000 and $1,800,000, respectively, from Xinhua Finance via Wire Mill Partners II and Wiremill.  *Id.* ¶ 55.  As a result of the Wiremill transactions, the defendants allegedly caused Xinhua Finance to furnish statements to the SEC that misrepresented and failed to disclose the transaction between Xinhua Finance, its CEO (Bush), and members of its Board of Directors (Singhal and Pelino) concerning the payment of monies from Xinhua Finance to Wire Mill Partners II and Wire Mill.  *Id.* ¶ 57.

The Indictment further alleges that in February 2006, Singhal directed a "round trip" of over $1 million originating from Xinhua Finance and paid back to Xinhua Finance via Singhal's nominee entities to purchase Xinhua Finance shares for Singhal's benefit.  According to the Indictment, Xinhua Finance paid $1,368,463.42 to Wiremill, an entity allegedly controlled by Singhal, which in turn wired $1,290,671.39 to another entity controlled by Singhal, SBI Advisors LLC.  *Id.* ¶¶ 13, 21, 52.  To facilitate the transfer, the Indictment alleges that SBI Advisors provided a bogus invoice to Wiremill.  *Id.* ¶ 62(ll).  SBI Advisors, in turn, wired $1,029,600 to Singhal's company, SBI USA.  *Id.* ¶ 62(mm).  SBI USA, in turn, wired $1,029,600 to Xinhua Finance to purchase 3,900 Xinhua Finance shares.  *Id.* ¶ 62(nn).

The Indictment also alleges that in May 2006, Singhal and Bush used Wire Mill Partners II, Wiremill, an Israeli company, and an Austrian Bank account as conduits to make a $1,000,000 payment from Xinhua Finance to Bush.  *Id.* ¶ 53.  According to the Indictment, in May 2006, Xinhua Finance paid $1,050,000 to Wire Mill Partners II in return for transactions purportedly introduced by Wiremill.  *Id.*  Wire Mill Partners II, in turn, wired $1,050,000 to Wiremill at Singhal's direction.  *Id.*  Wiremill, in turn, wired $1,000,000 at Singhal's direction to an account in Austria.  The Austrian account then wired $1,000,000 to an account in China for Bush's benefit.  *Id.*  To paper the transaction, the Indictment alleges that, at Singhal's direction,

identical consulting agreements were executed between Wiremill and an Israeli company, and between the Israeli company and Bush, which Bush allegedly signed in New York, New York. *Id.* ¶¶ 62(rr)–(ss).

The Indictment additionally alleges that in December 2006, Singhal and Bush used Wiremill as a conduit to make payments of $683,117 and $800,000 to Singhal and Bush, respectively. *Id.* ¶ 54. Those payments originated from a payment of $1,883,197.50 from Xinhua Finance to Wiremill, which Bush allegedly authorized. *Id.* ¶¶ 54, 62(vv). Wiremill, in turn, wired $683,117 at Singhal's direction to an account under Singhal's control. *Id.* ¶¶ 54, 62(yy). Wiremill separately wired $800,000 at Singhal's direction to a different nominee entity, Tamarack partners LLC, which was also under Singhal's control. *Id.* ¶¶ 22, 54, 62(zz). Tamarack Partners then wired the $800,000 to an account in China for Bush's benefit. *Id.* ¶¶ 54, 62(aaa).

### 4. *The Hyperion Transactions*

In or around the end of 2005 and the end of 2006, the securities assets received by Xinhua Finance via Wire Mill Partners II and Wiremill in consideration for Xinhua Finance providing business development services in China for various publicly traded companies listed in the United States posed a negative risk to Xinhua Finance's balance sheet if the securities assets declined in value. *Id.* ¶ 56. To minimize the potential impact to Xinhua Finance's balance sheet posed by those securities assets and other assets on Xinhua Finance's balance sheet declining in value, Xinhua Finance sold certain of the assets to Hyperion Investments Limited ("Hyperion"), a Bahamian corporation controlled by Singhal. *Id.* ¶¶ 19, 56. The Indictment alleges that Xinhua Finance announced publicly that it had issued a warrant to Hyperion and falsely identified Hyperion as "a third party independent company." *Id.* ¶ 62(kk). Singhal, according to

the Indictment, used Hyperion as a nominee to purchase the assets to disguise Singhal's interest and involvement in Hyperion's activities. *Id.* ¶ 56. As a result of the Hyperion transactions, the defendants allegedly caused Xinhua Finance to furnish statements to the SEC that misrepresented and failed to disclose the transaction between Xinhua Finance, its CEO (Bush), and members of its Board of Directors (Singhal and Pelino) concerning the sale of assets from Xinhua Finance to Hyperion. *Id.* ¶ 57.

## II.   ANALYSIS

### A.   Standard of Review

An indictment need only contain a "plain, concise and definite written statement of the essential facts constituting the offense charged. . . ." Fed R. Crim. P. 7(c). However, "an indictment is not required to set forth all the evidence the Government plans to present." *United States v. Palfrey*, 499 F. Supp. 2d 34, 45 (D.D.C. 2007) (citing *United States v. Haldeman*, 559 F.2d 31, 123–25 (D.C. Cir. 1976)). Rather, an indictment is sufficient if it (1) alleges the elements of the offense charged and fairly informs the defendant of those charges so that he may defend against them, and (2) enables the defendant to plead double jeopardy in any future prosecution for the same offense. *Hamling v. United States*, 418 U.S. 87, 117 (1974).

A defendant may move to dismiss an indictment on the grounds that it "fails to invoke the court's jurisdiction or to state an offense." Fed. R. Crim. P. 12(b)(3)(B). In ruling on a motion to dismiss under Rule 12, the Court must view must assume the factual allegations stated in the indictment as true. *United States v. Syring*, 522 F. Supp. 2d 125, 128 (D.D.C. 2007).

**B.** **Defendants' Motions to Dismiss Counts Six through Nine [39, 40, 44, 46, 47, 49]**

Defendants challenge Counts Six through Nine of the Indictment—the false statement counts—on a number of grounds. The Court will first consider Defendants' Motion [46] to Dismiss Counts Six through Nine for Failure to Allege a Duty to Disclose.

Counts Six through Nine charge defendants with making false statements in four Xinhua Finance reports furnished to the SEC, in violation of 18 U.S.C. § 1001 and 18 U.S.C. § 2. "Section 1001 proscribes two different types of conduct: concealment of material facts and false representations." *United States v. Crop Growers Corp.*, 954 F. Supp. 335, 344 (D.D.C. 1997). The Indictment contains three categories of alleged misconduct: the Entree Capital Transaction, the Bedrock Securities and Bedford Transactions, and the Wiremill and Hyperion Transactions.

In describing charged false statements conduct in the Entree Capital Transaction, the Indictment states:

> As a result of the Entree Capital transaction, defendants SHELLY S. SINGHAL, LORETTA FREDY BUSH and DENNIS L. PELINO caused Xinhua Finance to furnish statements to the SEC that misrepresented and failed to disclose: (a) a related party transaction between Xinhua Finance, its CEO (LORETTA FREDY BUSH), and members of its Board of Directors (SHELLY S. SINGHAL AND DENNIS L. PELINO) concerning the acquisition, acceleration of the lock-up period and exercise of the Xinhua Finance shares held by Entree Capital; (b) SHELLY S. SINGHAL, LORETTA FREDY BUSH and DENNIS L. PELINO had an ownership interest in the Xinhua finance shares held by Entree Capital; and (c) SHELLY S. SINGHAL, LORETTA FREDY BUSH and DENNIS L. PELINO sold Xinhua Finance shares through Entree Capital for their personal benefit.

Indictment ¶ 36. The Indictment contains no factual allegations of affirmative conduct by defendants in relation to the reporting of the Entree Capital transaction to or by Xinhua Finance, nor does the Indictment allege affirmative action by defendants in the reporting of their ownership of Xinhua Finance shares. Thus, the prosecution theory regarding the Entree Capital

11

transaction is that defendants, by their inaction, caused Xinhua Finance to fail to disclose information concerning that transaction.

In describing the Bedrock Securities and Bedford Transactions, the Indictment charges:

> As a result of the Bedrock Securities and Bedford transactions, defendants SHELLY S. SINGHAL, LORETTA FREDY BUSH and DENNIS L. PELINO caused Xinhua Finance to furnish statements to the SEC that misrepresented and failed to disclose: (a) a related party transaction between Xinhua Finance, its CEO (LORETTA FREDY BUSH), and members of its Board of Directors (SHELLY S. SINGHAL and DENNIS L. PELINO) concerning the sale of Xinhua Finance shares belonging to LORETTA FREDY BUSH and DENNIS L. PELINO, and (b) the number of Xinhua Finance Shares owned directly and beneficially by LORETTA FREDY BUSH and DENNIS L. PELINO.

Indictment ¶ 48.  The same concealment theory—premised on the inaction of the defendants—underlies the alleged false statements with respect to this second category of transactions as well.

Finally, in regard to the alleged false statements concerning the Wiremill and Hyperion Transactions, the Indictment charges:

> As a result of the Wiremill and Hyperion transactions, defendants SHELLY S. SINGHAL, LORETTA FREDY BUSH and DENNIS L. PELINO caused Xinhua Finance to furnish statements to the SEC that misrepresented and failed to disclose a related party transaction between Xinhua Finance, its CEO (LORETTA FREDY BUSH), and members of its Board of Directors (SHELLY S. SINGHAL and DENNIS L. PELINO) concerning the payment of monies from Xinhua Finance to Wire Mill Partners II and Wiremill and the sale of assets from Xinhua Finance to Hyperion.

Indictment ¶ 57.  The Indictment does not allege facts showing an affirmative representation of any kind regarding the Wiremill and Hyperion transactions.

Although the cited paragraphs repeat the statutory language of 18 U.S.C. § 1001 in alleging that Xinhua Finance furnished statements that "misrepresented and failed to disclose" information, the Indictment actually presents a failure to disclose, or concealment, theory only—defendants allegedly engaged in these transactions, Xinhua Finance's securities reports failed to disclose them, and defendants somehow caused these nondisclosures.  The Indictment's bald

allegations that Xinhua Finance furnished statements to the SEC that misrepresented the existence of related party transactions and the number of shares owned by Bush or Pelino are not sufficient to properly allege affirmative false statements by these defendants.  Not only does the Indictment fail to allege any affirmative false statements made by Xinhua Finance or any of the defendants regarding the undisclosed related party transactions at issue, but the Indictment also fails to allege any affirmative conduct by the defendants to cause Xinhua Finance to misrepresent the number of shares owned by Bush and Pelino.  Moreover, the facts in the remaining paragraphs of the Indictment cannot support a misrepresentation theory of the false statements charges.  Counts Six through Nine involve statements made on four specific dates: September 1, 2006; January 19, 2007; July 11, 2007; and December 7, 2007.  *See* Indictment ¶¶ 66, 68, 70, 72. The Court refuses to save the flawed Indictment, as the government suggests it do, by looking to alleged misrepresentations made on different dates that were not even charged or specifically incorporated by reference into Counts Six through Nine.  The absence of allegations of affirmative false representations by defendants is fatal to the government's false representations theory of the false statement charges in the Indictment.  *See Crop Growers*, 954 U.S. at 349.

The Court proceeds under this determination that the Indictment's false statement charges are based on a concealment theory only.  In concealment cases, "there must be a legal duty to disclose in order for there to be a concealment offense in violation of §1001(a)(1)."  *United States v. Safavian*, 528 F.3d 957, 964 (D.C. Cir. 2008).  To comply with Fifth Amendment due process, the defendant must have "fair notice . . . of what conduct is forbidden. . . . [T]his 'fair warning' requirement prohibits application of a criminal statute to a defendant unless it was reasonably clear at the time of the alleged action that defendants' actions were criminal."  *United*

*States v. Kanchanalak*, 192 F.3d 1037, 1046 (D.C. Cir. 1999) (citing *United States v. Lanier*, 520 U.S. 259, 266 (1997)).

The Indictment does not, however, allege that defendants had a legal duty under U.S. or foreign law to disclose the information allegedly concealed in reports Xinhua Finance furnished to the SEC.  There are no relevant U.S. statutes or regulations that imposed a duty upon Xinhua Finance, when it furnished its reports to the SEC pursuant to Rule 12g3-2(b), to conform to SEC disclosure rules.  Nor did Section 10(b) and Rule 10b-5 impose a legal duty to disclose on Xinhua Finance—this was precisely the reason that Xinhua Finance furnished the SEC with copies of its foreign filings to establish a Rule 12g exemption from the reporting requirements of § 13(a) of the Securities Exchange Act in the first place.  Neither does 17 C.F.R. § 240.12g3-2(b)(3) impose on Xinhua Finance a duty to disclose information material to an investment decision.  The government's interpretation of this regulation contradicts the text of Rule 12g3-2(b), which requires foreign issuers to furnish only those materials required by paragraph (b)(1). Paragraph (b)(3) does not set forth additional requirements, but instead narrows the scope of information required to be furnished under paragraph (b)(1).  *See* 17 C.F.R. § 240.12g3-2(b) (2005) (in effect during the relevant time period).  Moreover, there is no adequate allegation in the Indictment that any foreign law imposed a specific duty on either Xinhua Finance or the defendants to disclose the particular transactions described in the Indictment or the resulting number of shares held by Ms. Bush or Mr. Pelino.  While this duty may very well exist under foreign law, the government's references to an "obligation," without more, does not suffice to allege a specific legal duty as required under D.C. Circuit law.  *See, e.g.*, *Safavian*, 528 F.3d at 964 ("Concealment cases in this circuit and others have found a duty to disclose material facts on the basis of specific requirements for disclosure of specific information.")  Finally, the

Indictment's references to Xinhua Finance's corporate policies regarding insider trading and confidentiality do not give rise to a duty to disclose.  "[T]o the extent that any duty to disclose is predicated on professional standards not codified in any statute or regulation, there can be no criminal liability."  *Crop Growers*, 954 F. Supp. at 348.

Because the Indictment does not give defendants fair notice of the basis of the false statement charges against them, in violation of the Fifth Amendment, defendants' Motion [46] is GRANTED and Counts Six through Nine are DISMISSED.   Additionally, Count One is DISMISSED insofar as it alleges false statements.  The Court therefore need not reach the merits of the defendants' remaining Motions to dismiss the false statement counts of the Indictment, and DENIES AS MOOT the following Motions: Defendants' Motion [47] to Dismiss Counts Six through Nine for Lack of Materiality; Defendants' Motion [40] to Dismiss Counts Six through Nine for Failure to Allege a Matter within the Jurisdiction of the SEC; and Defendants' Motions [39, 44, 49] to Dismiss Counts Six through Nine for Failure to Allege a Crime Based on the Supreme Court's Recent *Janus* Decision.

### C.     Defendants' Motion to Dismiss Counts One through Nine Based on the Impermissible Extraterritorial Application of 18 U.S.C. §§ 1341 and 1001 [41]

Defendants move to dismiss Counts One through Nine of the Indictment on the basis that the 18 U.S.C. §§ 1341 and 1001 do not extend to the extraterritorial activity that constitutes the alleged scheme to defraud.  As the Court has already dismissed the false statements charges, this Motion [41] to dismiss is DENIED AS MOOT as to Count One (insofar as it alleges false statements) and DENIED AS MOOT as to Counts Six through Nine.  The Court will consider this Motion only insofar as it seeks to dismiss the mail fraud counts.

Defendants argue that the mail fraud counts should be dismissed because they violate the well-established principle that prohibits extraterritorial application of U.S. statutes unless congressional intent to the contrary is reflected clearly in the statute. According to defendants, the Court should rely on the Supreme Court's recent decision in *Morrison v. National Australia Bank Ltd.*, 130 S.Ct. 2869 (2010), to find that the mail fraud statute, 18 U.S.C. § 1341, cannot be applied extraterritorially.

The defendants' reliance on *Morrison* is misguided. *Morrison* held that section 10(b) of the Securities Exchange Act does not extend to extraterritorial conduct and applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Morrison*, 130 S.Ct. at 2884. The cases defendants cite that construe *Morrison* have not extended its reasoning to a criminal case such as this one, which was not brought under § 10(b). Instead, the relevant analysis to determine a criminal statute's extraterritorial application is guided by *United States v. Bowman*, 260 U.S. 94 (1922), which cautioned that the presumption against the extraterritorial application of a U.S. statute "should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers or agents. *Bowman*, 260 U.S. at 98.

However, this Court need not reach the question of whether 18 U.S.C. § 1341 was enacted to protect the right of the government to defend itself against obstruction or fraud that occurred territorially, because the transactions that form the basis of the charges here occurred in the District of Columbia when defendants furnished statements to the SEC through the use of the U.S. mails. The fact that those mailings originated in China or Japan is irrelevant for purposes of

determining the sufficiency of the Indictment.  Defendants attack this reasoning by pointing out that because the mail fraud statute requires proof of a U.S. mailing, every alleged mail fraud is automatically a domestic application.  But that is precisely the point of the mail fraud statute: once a person uses the U.S. mails, they are subject to the mail fraud statute pursuant to their domestic activity—making an analysis of the statute's extraterritorial application unnecessary in a case such as this one.

Defendants' Motion [41] to Dismiss is therefore DENIED as to Count One (insofar as it alleges mail fraud) and DENIED as to Counts Two through Five.

> **D.      Defendants' Motion to Dismiss the Indictment for Vagueness as to Applicable Foreign Law and to Compel the Government to Produce the Instructions Used before the Grand Jury [42]; Defendants' Motion to Dismiss Counts One through Nine Because these Charges are Unconstitutionally Vague as Applied to these Defendants [45]**

Defendants also move to dismiss the Indictment for vagueness as to the applicable foreign law, and move to compel the government to produce the instructions used before the grand jury.  The Court will address that Motion [42] simultaneously with defendants' Motion [45] to dismiss Counts One through Nine on the basis that these charges are unconstitutionally vague as applied to these defendants.  Because the Court has dismissed the false statements counts, these Motions [42, 45] are DENIED AS MOOT as to Count One (insofar as it alleges false statements) and DENIED AS MOOT as to Counts Six through Nine.  The Court proceeds to address these Motions insofar as they seek to dismiss the mail fraud counts.

As alleged in the Indictment, the charged offenses are violations of U.S. criminal law, 18 U.S.C. § 1341.  These offenses concern materials Xinhua Finance furnished to the SEC and do not stem from, or depend upon, foreign law.  Defendants miss the point in arguing that under Rule 12g3-2(b), Xinhua Finance was simply required to furnish the SEC with English copies of

reports prepared for foreign regulators, and that the Indictment fails to identify what foreign law mandated Xinhua Finance to disclose the related-party transactions and share sales that took place.  Regardless of whether defendants violated foreign securities laws, they are charged here not with violating those laws, but with violating U.S. criminal law by causing Xinhua Finance to mail to the SEC statements which contained falsifications and material omissions.  Unlike in the false statements counts, the mail fraud counts in the Indictment need not allege a legal duty imposed on defendants under U.S. law, or a violation of that duty.  *Cf. Safavian*, 528 F.3d at 964.

Additionally, defendants' argument that Xinhua Finance was required only to furnish translations of material it had already filed in foreign jurisdictions is incorrect, as evidenced from the plain language of the SEC regulation.  Under 17 C.F.R.§ 240.12g3-2(b)(1), to obtain a filing exemption under Rule 12g3-2(b) Xinhua Finance was required to furnish the SEC with information that it *has made or is required to make public* pursuant to the law of the country of its domicile or in which it is incorporated or organized, *has filed or is required to file* with a stock exchange on which its securities are traded and which was made public by such exchange, or *has distributed or is required to distribute* to its security holders.  17 C.F.R. § 240.12g3-2(b)(1) (2005) (emphasis added).  The fact that the materials Xinhua Finance furnished to the SEC were English translations of materials already filed with other countries' regulators does not necessarily lead to the conclusion that the materials were prepared in accordance with the foreign law governing the filings in foreign jurisdictions.  Nor did the regulatory language preclude defendants from conforming Xinhua Finance's foreign filings with U.S. law when they caused Xinhua Finance to furnish those materials to the SEC.  *See id.*

Moreover, the mail fraud statute is not unconstitutionally vague as applied to the facts alleged in the Indictment: a continuing fraudulent scheme advanced in the United States through

mailings which contain material misrepresentations and omissions.  In examining a statute for vagueness, the Court must determine whether a person of average intelligence would reasonably understand that the charged conduct is proscribed.  *United States v. Mazurie*, 419 U.S. 544, 553 (1975).  The Indictment alleges that defendants were engaged in a scheme to defraud and to obtain money from Xinhua Finance by engaging in and concealing various related-party transactions and sales of shares.  When Xinhua Finance sought access to American capital markets, which required the mailing of various materials to the SEC, and which materials allegedly misrepresented and concealed the activity, "[a] person of ordinary intelligence would reasonably understand that those actions were proscribed by a statute that criminalizes the use of the mails . . . to perpetrate a fraud."  *United States v. Williams*, 441 F.3d 716, 724–25 (9th Cir. 2006).

Finally, the Court finds no basis here to compel the government to produce any transcripts showing the grand jury's legal charge.  Federal Rule of Criminal Procedure 6(e) permits the disclosure of grand jury materials in narrow circumstances.  However, the "indispensable secrecy of grand jury proceedings . . . must not be broken except where there is a compelling necessity."  *United States v. Proctor & Gamble*, 356 U.S. 677, 682 (1958).  A defendant requesting disclosure of grand jury transcripts must show a "particularized need" for such information.  *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 222–23 (1979).  Defendants are unable to identify any portion of the Indictment that suggests that any charge to the grand jury was legally erroneous, and resorts to speculation about what the grand jury was instructed based on what is *not* stated in the Indictment.  Where, as here, the Indictment is facially valid and defendants' claims do not justify dismissal of the Indictment, defendants have not established any particularized need for the grand jury instructions to be disclosed.  *See*

*United States v. Espy*, 23 F. Supp. 2d 1, 10 (D.D.C. 1998); *United States v. Trie*, 23 F. Supp. 2d 55, 62 (D.D.C. 1998).   Moreover, "the mere suspicion that the grand jury may not have been properly instructed . . . is insufficient to establish that [defendants are] entitled either to dismissal of the indictment or to disclosure of grand jury materials." *Id.*

Defendants' Motions [42, 45] to dismiss and to compel are therefore DENIED as to Count One (insofar as it alleges mail fraud) and DENIED as to Counts Two through Five.

### E.      Defendants' Motion to Dismiss Counts Two through Five for Failure to Adequately Allege Mail Fraud under 18 U.S.C. § 1341 [43]

Defendants also move to dismiss Counts Two through Five of the Indictment—the mail fraud counts—for failure to state a claim of mail fraud pursuant to 18 U.S.C. § 1341.  Defendants argue that these counts, which involve four separate mailings but refer to the same alleged scheme to defraud, fail to properly allege mail fraud for four reasons.

First, defendants say that the Indictment's alleged scheme to defraud is written so ambiguously that the allegedly prohibited conduct cannot be discerned, and thus fail to provide defendants with fair notice of the charges against them in violation of the Fifth and Sixth Amendments.   Although Counts Two through Five of the Indictment are admittedly poorly worded and contain grammatical errors, the constitutional test is not whether the Indictment is grammatically correct, but whether it "fairly informs a defendant of the charge against which he must defend." *Hamling v. United States*, 418 U.S. 87, 117 (1974).  "Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Id.* at 117–18 (internal quotation and citation omitted).  Combined with the allegations set forth in Paragraphs 1 through 57 of the Indictment—which were specifically incorporated by reference in Counts

Two through Five—the Indictment sufficiently alleges all of the elements of mail fraud to put the defendants on notice of the mail fraud charges against them. The Court therefore chooses neither to dismiss the Indictment, as defendants request, nor to amend the wording of Counts Two through Five, as the government suggests.

Second, defendants claim that the Indictment fails to allege that the SEC or investors suffered a loss of property or money and as a result, the portions of the scheme that purport to allege that the SEC or investors were defrauded must be dismissed. The mail fraud statute makes it a criminal offense to devise or intend to devise "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. An indictment charging mail fraud is not required to allege actual monetary loss. "It is only necessary to establish a scheme to defraud, and a mailing in furtherance thereof; it is not necessary even to show that a loss took place." *United States v. Reid*, 533 F.2d 1255, 1261 (D.C. Cir. 1976). That is, "[i]t is the scheme to defraud and not actual fraud that is required." *Id.* at 1264. Moreover, victims of the fraud need not be identified in the Indictment. *See United States v. Mizyed*, 927 F.2d 979, 981 (7th Cir. 1991). The Indictment alleges that defendants engaged in a scheme to obtain things of value from Xinhua Finance through undisclosed related party transactions and payments to defendants, and to obtain money and/or property from the undisclosed sale of Xinhua Finance stock. Defendants have failed to explain why, in light of these allegations, the mail fraud counts must allege that the SEC or investors suffered a loss of property or money as a result of the alleged scheme to defraud.

Third, defendants argue that the mail fraud counts are duplicitous because each of the four mailings is alleged in support of three separate and distinct prongs of a scheme to defraud, which defendants claim to have additional sub-schemes. According to defendants, these

schemes constitute different offenses and must be charged in separate counts.  However, it is well established in the D.C. Circuit that "if a criminal statute disjunctively lists multiple acts which constitute violations, the prosecution may in a single count of an indictment or information charge several or all of such acts in the conjunctive and under such charge make proof of any one or more of the acts, proof of one alone, however, being sufficient to support a conviction."  *United States v. Brown*, 504 F.3d 99, 104 (D.C. Cir. 2007) (internal quotation and citations omitted).  The multiple schemes that defendants purport to find in the Indictment are simply various means through which the alleged conspiracy and mail fraud offenses were committed in furtherance of a unitary scheme.  Any fears of jury confusion and prejudice that defendants have could easily be addressed by appropriate jury instructions at trial.

Fourth, defendants say that none of the mailings identified in the Indictment is sufficiently closely related to the alleged scheme to defraud to be "in furtherance" of the scheme. To prove mail fraud, the government must prove "(1) a scheme to defraud, and (2) the mailing of a letter, etc. for the purpose of executing the scheme."  *United States v. Reid*, 533 F.2d 1255, 1264 (D.C. Cir. 1976) (internal quotation omitted).  To commit the offense, the defendant must have fraudulent intent at the time of the charged mailing—that is, he must both have a fraudulent scheme in mind and intend that the mailing further that scheme.  *See* 18 U.S.C. § 1341; *see also Schmuck v. United States*, 489 U.S. 705, 715 (1989).  "The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud."  *Schmuck*, 489 U.S. at 710.  But "[i]t is not necessary that the scheme contemplate the use of the mails as an essential element."  *Pereira v. United States*, 347 U.S. 1, 8 (1954).  Rather, "[i]t is sufficient for the mailing to be incident to an essential part of the scheme, or a step in the plot."  *Schmuck*, 489 U.S. at 710–11 (internal quotations and

citations omitted.)   Moreover, where, as here, the alleged scheme was an ongoing operation, there is no requirement that the mailings precede the fraud.   *See, e.g.*, *id.*; *United States v. Sampson*, 371 U.S. 75, 79–80 (1962).   Under this standard, it is clear that the mailings to the SEC were in furtherance of the alleged scheme as incident to an essential part of it.   The mailings allegedly helped defendants maintain their ongoing fraudulent scheme by avoiding detection by existing investor-owners of Xinhua Finance to prevent the share value from being negatively impacted, ensuring that Xinhua Finance continued to receive funds from prospective investors, and that defendants could sell shares of Xinhua Finance to prospective buyers.

Defendants' argument that the Indictment should be dismissed because it contains no allegation that defendants wrote or reviewed the reports furnished to the SEC is equally meritless.   Proving mail fraud does not require the government to show that defendants themselves made or directed the mailing, only that they caused the mailing to be made.   *Pereira v. United States*, 347 U.S. 1, 8 (1954).

Defendants' Motion [43] to dismiss Counts Two through Five for failure to adequately allege mail fraud under 18 U.S.C. § 1341 is therefore DENIED.

### F.   Defendants' Motion to Dismiss the Indictment for Lack of Venue [48]

Defendants also move to dismiss the Indictment for lack of venue pursuant to Federal Rule of Criminal Procedure 18.   Because the false statements counts have been dismissed, defendants' Motion [48] is DENIED AS MOOT as to Count One (insofar as it alleges false statements) and DENIED AS MOOT as to Counts Six through Nine.   The Court proceeds to address defendants' Motion [48] to dismiss for lack of venue insofar as it seeks to dismiss the mail fraud and conspiracy counts.

Prosecution for mail fraud under 18 U.S.C. § 1341 is permissible only in those districts where the defendant "places," "deposits," "causes to be deposited," "takes," or "receives" mail, or "knowingly causes mail to be delivered." 18 U.S.C. § 1341; *see United States v. Morgan*, 393 F.3d 192, 198 (D.C. Cir. 2004) (citing *United States v. Brennan*, 183 F.3d 139, 147 (2d Cir. 1999)). Defendants properly point out that the SEC's receipt of Xinhua Finance reports does not establish venue against them in the District of Columbia. However, the Indictment alleges that defendants caused the mailings, and there is no requirement that the government allege that defendants had actual knowledge of the mailings or specifically intended to use the mails. Rather, "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Pereira*, 347 U.S. at 8–9 (citing *United States v. Kenofskey*, 243 U.S. 440 (1917)). Here, the proscribed use of the mails was the defendants causing Xinhua Finance to furnish statements to the SEC in the District of Columbia that misrepresented and failed to disclose certain allegedly material information. The Indictment also alleges that defendants aided and abetted the mail fraud violation. These allegations are sufficient to allege venue for mail fraud in the District of Columbia.

Additionally, it is well established that "a conspiracy prosecution may be brought in any district in which some overt act in furtherance of the conspiracy was committed by any of the co-conspirators." *United States v. Rosenberg*, 888 F.2d 1406, 1415 (D.C. Cir. 1989) (citing *Hyde v. United States*, 225 U.S. 347, 363–64 (1912)). The crime of conspiracy, 18 U.S.C. § 371, is a continuing offense, the prosecution of which is proper "in any district in which such offense was begun, continued or completed." 18 U.S.C. § 3237(a). The Indictment sufficiently alleges venue

for conspiracy in the District of Columbia by alleging that defendants caused Xinhua Finance to furnish reports to the SEC in the District of Columbia.

Defendants' Motion [48] to dismiss the Indictment for lack of venue is therefore DENIED as to Count One (insofar as it alleges mail fraud) and DENIED as to Counts Two through Five.

### G.   Defendants' Motion to Strike Irrelevant and Prejudicial Surplusage from the Indictment [50]

Defendants additionally move to strike certain language from the Indictment that they argue is not necessary to support the charges and is prejudicial to defendants.   An indictment must give a "plain, concise, and definite written statement of the essential facts constituting the offense charged."   Fed. R. Crim. P. 7(c).   Federal Rule of Criminal Procedure 7(d) allows the Court to strike surplusage from an indictment upon the defendant's motion and provides protection against irrelevant and prejudicial allegations in the indictment.   Fed. R. Crim. P. 7(d).   "Surplusage" is defined as "redundant words in a statute or legal instrument," "language that does not add meaning," and "extraneous matter in a pleading."   *Black's Law Dictionary* 1581 (9th ed. 2009).   "Motions to strike surplusage from an indictment are highly disfavored in this Circuit."   *United States v. Watt*, 911 F. Supp. 538, 554 (D.D.C. 1995).   A motion to strike surplusage from an indictment "should be granted only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial."   *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir. 1998).

Defendants move to: (1) ensure that "Xinhua Finance Limited" and "Xinhua Financial Network Limited" are appropriately identified throughout the Indictment; (2) strike the references to "related party transactions" from paragraphs 42, 43, 45, and 48; (3) strike the phrase "insider trading" from paragraphs 1, 30, 37, 38, 42, 43, 60, and 61.c; (4) amend

paragraphs 2, 3, 23, and 59 to remove surplusage; and (5) strike, in their entirety, paragraphs 37, 38, 41, 62.a–62.d, 62.h, 62.z–62.ff, and 62.gg.

The Indictment refers collectively to "Xinhua Finance Limited" and "Xinhua Financial Network Limited" as "Xinhua Finance," thereby conflating a public, wholly-owned corporate affiliate with its non-public parent corporation.  The Indictment is premised on corporate disclosure issues concerning the relationships between corporate entities and the defendants.  At trial, the jury will be tasked with understanding the relationships among these entities and their involvement in the schemes alleged in the Indictment.  The Indictment's imprecision and failure to properly attribute activity to specific entities adds to this complexity and the burden on the jury.  Such confusion is unfairly prejudicial to defendants.  The Court therefore ORDERS the government to revise the Indictment to ensure that the phrase "Xinhua Finance" is replaced by either "Xinhua Finance Limited" or "Xinhua Financial Network Limited," as applicable.

In describing the Bedrock Securities and Bedford Transactions, paragraphs 42, 43, 45, and 48 of the Indictment refer to a "related party transaction"—defined by U.S. securities law to be a transaction "in which the registrant was or is to be a participant . . . and in which any related party had or will have a direct or indirect material interest."  17 C.F.R. § 229.404(a).  However, in reference to the Bedrock Securities and Bedford Transactions, the government uses the term "related party transaction" to refer to a transaction between officers or directors of a foreign private issuer that must be disclosed to the SEC.  There is no allegation in these paragraphs that Xinhua Finance was in any way a participant in the purported stock sales.  The government cites no authority for its deviation from the definition under U.S. securities law.  As no related party transaction is properly alleged with respect to the Bedrock Securities and Bedford Transactions, the repeated mention of the term is incorrect, confusing, misleading, and unfairly prejudicial to

defendants.  The Court therefore ORDERS the government to strike the references to a "related party transaction" from paragraphs 42, 43, 45, and 48.

Paragraphs 37 and 38 of the Indictment describe corporate insider trading and confidentiality policies distributed to Xinhua Finance officers, directors, and employees. Paragraphs 1, 30, 42, 43, 45, 60, and 61.c specifically use the term "insider trading."  These references are highly prejudicial to defendants because they reference a current hot topic in U.S. law that the defendants are not even charged with in this case.  The Indictment's references to insider trading and corporate insider trading and confidentiality policies are also prejudicial to defendants because these references could lead the jury to confuse the potential violation of a corporate policy with the violation of law.  Any obligation to disclose that defendants owed under corporate policy was only an obligation under that policy—not a duty under U.S. securities law.  As previously explained, "to the extent that any duty to disclose is predicated on professional standards not codified in any statute or regulation, there can be no criminal liability." *Crop Growers*, 954 F. Supp. at 348.  The Court therefore ORDERS the government to strike the references to "insider trading" from paragraphs 1, 30, 42, 43, 60, and 61.c and to strike paragraphs 37 and 38 in their entirety.

The Court finds that the prejudicial effect of the remaining content of the Indictment that defendants challenge does not outweigh its relevance, and therefore all other requests in defendants' Motion [50] to strike are DENIED.

### H.    Defendants' Motion to Compel Discovery of Rule 16 and *Brady* Material in the Possession of the United States [51].

Defendants moved to compel seven categories of information from the government based on Federal Rule of Criminal Procedure 16 and *Brady v. Maryland*, 373 U.S. 83 (1963).  Federal Rule of Criminal Procedure 16(a)(1)(E)(i) directs the government to produce documents that are

"material to preparing the defense." Information is material under Rule 16 "as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993). In addition, in the pretrial setting, *Brady* requires disclosure of any information "'favorable to the accused' . . . without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial." *United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005) (citing *United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1198–99 (C.D. Cal. 1999). Information is favorable to the accused if it "relates to guilt or punishment" and "tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses." *Id.* "[C]ourts in this jurisdiction look with disfavor on narrow readings by prosecutors of the government's obligations under *Brady*." *United States v. Edwards*, 191 F. Supp. 2d 88, 89–90 (D.D.C. 2002) (citing *United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988)).

In its opposition [58], the government agreed to provide sufficient information or documents regarding four categories of information requested by defendants in their Motion [51] to compel. To the extent the government has not turned over information or documents that it previously agreed to provide to defendants, the government is ORDERED to do so within 30 days of the date of this Order. Three categories of information remain pending before the Court.

First, defendants move to compel the government to identify the laws or regulations that imposed an obligation on Xinhua Finance, or its officers or directors, to disclose certain information in Xinhua Finance's foreign filings. Although the laws or regulations that imposed a duty to disclose on Xinhua Finance are relevant to the false statement claims against defendants, these claims have been dismissed. And as discussed earlier, defendants can be charged with mail

fraud regardless of whether defendants had a duty to disclose.  The Court therefore DENIES defendants' Motion [51] to compel insofar as defendants seek to compel the government to identify the laws or regulations that impose a duty to disclose on Xinhua Finance, its officers, or its directors.

Second, defendants seek the identity (by Bates number) of the specific witness statements and documents evidencing that any of the defendants had an opportunity to review certain Xinhua Finance public filings as alleged in paragraph 24 of the Indictment.  Defendant Bush also requests evidence that she did not review the filings.  The specific witness statements and documents requested, if any exist, are producible as Rule 16(a)(1)(E)(i) documents material to preparing the defense, regardless of whether those documents are inculpatory or exculpatory. *See United States v. Marshall*, 132 F.3d 63, 67 (D.C. Cir. 1998).  Therefore, to the extent they exist, the Court ORDERS the government to specifically identify and produce these requested witness statements and documents at least 30 days before trial.

Third, defendants seek copies of any requests made to a foreign government or foreign court for evidence located outside the United States during the course of the government's investigation into matters related to the Indictment.  Although the results of these requests would be material to preparing the defense, the requests themselves are not.  The Court therefore DENIES defendants' Motion [51] to compel insofar as defendants seek copies of any requests the government made to foreign entities for evidence located outside the United States.

I.      **Defendant Singhal's Motion to Compel Production of Documents and for an Evidentiary Hearing to Determine the Extent of the Receipt and Use of Privileged Information by the Government [52, 54]**

Finally, defendant Singhal moves to compel the government to produce all documents reflecting its communications, including e-mails and notes of telephone conversations or

meetings, with attorney Robert Brown or his attorneys.  Singhal requests that these documents be provided to the defense so that Singhal can properly gauge the extent to which his attorney-client privilege has been violated.  Singhal also argues that these documents should be provided to the defense under Federal Rule of Criminal Procedure 16, *Giglio v. United States*, 405 U.S. 150 (1972), the *Jencks* Act, and as *Brady* material.  Additionally, Singhal requests that the Court order an evidentiary hearing to determine the full extent and scope of the receipt and use of privileged information by the government from Brown.

The government's communications with Brown—Singhal's former attorney—are producible under *Brady* and Federal Rule of Criminal Procedure 16(a)(1)(E)(i).  The materials sought by Singhal's Motion [52, 54] to compel are directly tied to the knowledge and statements of the government's chief witness and could help the defense impeach Brown as a potential prosecution witness.  *Safavian*, 233 F.R.D. at 16.  Additionally, Brown's discussions with government attorneys are material to the defense's preparation of its case, as they will allow the defense to uncover admissible evidence, prepare for its examination of witnesses (including Brown), corroborate testimony, or assist with impeachment of witnesses at trial (including Brown).  *Lloyd*, 992 F.2d at 351.

As such, the Court GRANTS IN PART Singhal's Motion [52, 54] to compel and ORDERS that, within 30 days of the date of this Order, the government shall produce all documents reflecting its communications, including e-mails and notes of telephone conversations or meetings, with attorney Robert Brown.  To the extent that defendant Singhal wishes to assert the attorney-client privilege over those communications, he may do so at that time.  The Court therefore DENIES Singhal's request for an evidentiary hearing to determine the extent of the receipt and use of privileged information by the government.  The Court also DENIES Singhal's

Motion [52, 54] to compel the government to produce all documents reflecting the government's communications with Robert Brown's attorneys, as this information is not material to the defense's preparation of its case under Rule 16.

## III.    CONCLUSION

This case represents an attempt by the federal government to expand the legal duties owed to the United States Securities and Exchange Commission by a corporate entity that is organized under the laws of the Cayman Islands, headquartered in China, traded publicly in Japan, and exempt from SEC reporting requirements—by charging the defendants with false statements and mail fraud.  On the face of the Indictment, however, many of these counts do not pass constitutional muster.  The Court therefore dismisses the false statement charges against defendants in Counts Six through Nine, as well as the charges of conspiracy to make false statements in Count One.

In light of the foregoing, this case shall proceed to trial on Count One insofar as it alleges mail fraud, Counts Two through Five, and Count Ten.  A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on July 11, 2012.